# United States District Court

EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

|  |  |  |
|---|---|---|
| DAVID ALLEN RUSSELL, #01859812 | § | |
| | § | CIVIL ACTION NO. 4:22-CV-01050-ALM- |
| VS. | § | AGD *consolidated with* 4:22-CV-01055-ALM- |
| | § | AGD, 4:22-CV-01056-ALM-AGD, 4:22-CV- |
| DIRECTOR, TDCJ-CID | § | 01057-ALM-AGD |

## <u>MEMORANDUM OPINION AND ORDER</u>

Petitioner David Allen Russell, an inmate confined in the Texas prison system, with the assistance of counsel, filed petitions for writs of habeas corpus pursuant to 28 U.S.C. § 2254. After due consideration and for the reasons stated below, the Court will deny the petitions.

### I. PROCEDURAL BACKGROUND

Petitioner is challenging his Collin County, Texas convictions in Cause Nos. 199-80629-2013, 199-81323-2012, 199-81325-2012, and 199-81326-2012 (81326).[1] In Cause No. 80629, Petitioner was charged with two counts of indecency with a child by sexual contact based on Petitioner's touching of E.L.'s breast and genitals with his hand when E.L. was younger than seventeen years old, and one count of sexual assault based on Petitioner's penetration of E.L.'s sexual organ by his finger without her consent.[2] (Dkt. #28-4 at 81).[3] In Cause No. 81323, he was charged with one count of sexual assault of a child based on Petitioner's penetration of M.C.'s sexual organ by his finger when M.C. was younger than seventeen years old and two counts of indecency with a child by sexual contact based on Petitioner's touching of M.C.'s breast and

---

[1] 199-81322-2012 The Court will refer to each cause number by its middle five digits.

[2] The latter alleged sexual assault occurred when E.L. was an adult.

[3] All citations to the record, unless otherwise noted, are to the lead case, 4:22cv1050, and to the PDF page number of the ECF filing.

genitals with his hand when M.C. was younger than seventeen years old. (Dkt. #28-1 at 12). In Cause No. 81325, Petitioner was charged with one count of sexual assault based on Petitioner's penetration of adult-complainant M.H.'s sexual organ by his finger without her consent. (Dkt. #28-2 at 11). And in Cause No. 81326, Petitioner was charged with one count of aggravated sexual assault of a child based on Petitioner's penetration of H.B.'s sexual organ by his finger when H.B. was younger than fourteen years old and one count of indecency with a child by sexual contact based on Petitioner's touching of H.B.'s genitals with his hand when H.B. was younger than seventeen years old.[4] (Dkt. #28-3 at 14).

The cause numbers were consolidated for trial, and on April 24, 2013, a jury found Petitioner guilty of one count of sexual assault of E.L. (Dkt. #28-4 at 116, 125), one count of sexual assault of a child regarding M.C. (Dkt. #28-1 at 95, 106), one count of indecency with a child by sexual contact based on Petitioner's touching of M.C.'s breast with his hand (Dkt. #28-1 at 96, 112), one count of sexual assault of M.H. (Dkt. #28-2 at 101), and one count of indecency with a child by sexual contact based on Petitioner's touching of H.B.'s genitals with his hand (Dkt. #28-3 at 97, 104).[5]

Petitioner was sentenced to ten years' confinement for sexual assault of E.L. (Dkt. #28-4 at 122, 125), fifteen years' confinement for sexual assault of a child regarding M.C. (Dkt. #28-1 at 106), eight years' confinement for indecency with a child regarding M.C. (Dkt. #28-1 at 112), ten years' confinement for sexual assault of M.H. (Dkt. #28-2 at 99, 101), and twelve years'

---

[4] Petitioner was also charged with aggravated sexual assault of a child and indecency with a child by contact regarding S.S. in Cause No. 199-81322-2012. (Dkt. #15 at 14–15). The jury acquitted him on those charges. (Dkt. #15 at 15).

[5] The jury acquitted Petitioner of two counts of indecency with a child regarding E.L. (Dkt. #28-4 at 114-15, 124), one count of indecency with a child based on Petitioner's touching of M.C.'s genitals with his hand (Dkt. #28-1 at 111), and one count of aggravated sexual assault of a child (H.B.). (Dkt. #28-3 at 97, 103).

confinement for indecency with a child regarding H.B. (Dkt. #28-3 at 102, 104). The trial court ordered the fifteen-year sentence for sexual assault of a child related to M.C. to run concurrently with the sentences in the other causes and the eight-year sentence for indecency with a child related to M.C. to run consecutively. (Dkt. #26-14 at 14 268–69; Dkt. #28-1 at 106, 112).

On April 9, 2015, the Thirteenth District Court of Appeals of Texas affirmed Petitioner's convictions. *Russell v. State*, Nos. 13-13-00372, 13-13-00373, 13-13-00374 & 13-13-00375-CR, 2015 WL 1631861 (Tex. App.— Corpus Christi-Edinburg Apr. 9, 2015, pet. ref'd). The Texas Court of Criminal Appeals ("TCCA") refused Petitioner's petitions for discretionary review ("PDR") on July 29, 2015. *Russell v. State*, Nos. PD-0547-15, PD-0548-15, PD-0549-15, PD-0550-15. Petitioner did not file petitions for writs of certiorari with the United States Supreme Court. (Dkt. #2 at 3).

On October 25, 2016, Petitioner, with the assistance of counsel, filed separate applications for state habeas corpus relief challenging his convictions in each cause number. (Dkt. #28-5 at 88–104; Dkt. #28-7 at 77–93; Dkt. #28-9 at 84–100; Dkt. #28-11 at 95–111). The state habeas trial court conducted an evidentiary hearing on January 31, 2022. (Dkt. #28-6 at 17–165). On June 25, 2022, the state habeas trial court entered findings of facts and conclusions of law and recommended that each application be denied. (Dkt. #24-5 at 179–213; Dkt. #24-20 at 178-211; Dkt. #25-5 at 180–213; Dkt. #25-19 at 178–211). On August 10, 2022, Petitioner filed amended state habeas applications. (Dkt. #24-8 at 12–30; Dkt. #24-23 at 11–29; Dkt. #25-8 at 13-31; Dkt. #25-22 at 11–29). The TCCA remanded the applications to the state habeas trial court to make additional findings and conclusions on whether trial counsel was ineffective during the punishment-phase of trial for failing to present medical records regarding Petitioner's kidney disease and testimony from his treating physician to corroborate his girlfriend's testimony. (Dkt. #23-20). On September 15, 2022, the

3

state habeas trial court entered additional findings of facts and conclusions of law and recommended that each application be denied. (Dkt. #24-10 at 31–35; Dkt. #24-25 at 30–34; Dkt. #25-10 at 32–36; Dkt. #25-24 at 30–34). On December 14, 2022, the TCCA denied each application without written order based on the findings of the state habeas trial court after a hearing and on its independent review of the record. (Dkt. #23-21).

Petitioner, with the assistance of counsel, filed the instant petitions on December 15, 2022.[6] (Dkt. #2). Petitioner asserts the following claims for relief:

(1)    Petitioner was denied effective assistance of counsel during the guilt-innocence phase of trial because trial counsel:

    (a) failed to object to and elicited inadmissible and prejudicial testimony; and

    (b) failed to request defensive jury instructions.

(2)    Petitioner was constructively denied the assistance of counsel at the hearing on the first jury note.

(3)    Petitioner was denied effective assistance of counsel during the punishment phase of trial because trial counsel:

    (a) failed to object to prosecution witnesses' improper opinions that Petitioner deserved a prison sentence instead of probation; and

    (b) failed to offer medical records and expert testimony related to Petitioner's kidney disease.

(4)    Petitioner was denied effective assistance of counsel because appellate counsel:

    (a) failed to raise a *Cronic* claim;

---

[6] Petitioner initially filed one federal petition, challenging his convictions in all cause numbers. The court severed Petitioner's case into four separate actions, Civil Action Nos. 4:22-cv-1050, 4:22-cv-1055, 4:22-cv-1056, and 4:22-cv-1057. (Dkt. #5). The actions were subsequently consolidated, and Civil Action No. 4:22cv1050 was designated as the lead case. (Docket entry dated 7/24/2023).

(b) failed to raise an article 36.27 claim and related constitutional claim that Petitioner's right to presence was violated; and

(c) failed to raise a sufficiency of the evidence claim as to sexual assault of E.L.

(Dkt. #2 at 6–8; Dkt. #15 at 17).

The Director filed a response, arguing that the claims are without merit. (Dkt. #20). Petitioner filed a reply. (Dkt. #31).

## II. FACTUAL BACKGROUND

Petitioner was a chiropractor with several patients, including complainants M.C. and H.B., who were young dancers from his girlfriend Suzan Taylor's dance studio (Taylor Dance Studio). *Russell*, No. 13-13-00372-CR, 2015 WL 1631861, at *1. (Dkt. #26-8 at 164). Complainants M.H. and E.L. were also patients of Petitioner but did not attend Taylor Dance Studio. (Dkt. #26-8 at 164–65). Detective Techia Davis began investigating Petitioner in October 2011, after Carla Mullendore, who had been a dance instructor at Taylor Dance Studio and a patient of Petitioner, reported the sexual abuse of H.B. and M.C. (Dkt. #26-7 at 320; Dkt. #26-8 at 186, 193, 206). Some of Petitioner's patients testified that, during chiropractic treatments in Petitioner's office, Petitioner had touched their vaginas, inserted his finger in their vaginas, and touched their breasts. *Russell*, No. 13-13-00372-CR, 2015 WL 1631861, at *1. All of the complainants testified at the consolidated trial. *Id.* The main defensive theory at trial was that any inappropriate touching was incidental, not intentional. (Dkt. #24-5 at 179, ¶ 4).

## III. STANDARD FOR FEDERAL HABEAS CORPUS RELIEF

The role of federal courts in reviewing habeas corpus petitions by prisoners in state custody is exceedingly narrow. A person seeking federal habeas corpus review must assert a violation of a

federal constitutional right. *Lowery v. Collins*, 988 F.2d 1354, 1367 (5th Cir. 1993); *Malchi v. Thaler*, 211 F.3d 953, 957 (5th Cir. 2000). Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005). In the course of reviewing state proceedings, a federal court does not sit as a super state appellate court. *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986).

The prospect of federal courts granting habeas corpus relief to state prisoners has been further limited by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The new provisions of § 2254(d) provide that an application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) was contrary to federal law then clearly established in the holdings of the Supreme Court; (2) involved an unreasonable application of clearly established Supreme Court precedent; or (3) was based on an unreasonable determination of the facts in light of the record before the state court. *See Harrington v. Richter*, 562 U.S. 86, 97-98 (2011).

The statutory provision requires federal courts to be deferential to habeas corpus decisions on the merits by state courts. *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). Furthermore, a state court's factual findings are entitled to deference and are presumed correct unless the petitioner rebuts those findings with clear and convincing evidence. *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010); *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006); *Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001); *see also Moore*, 313 F.3d at 881 (the statutory provision requires federal courts to be deferential to habeas corpus decisions

6

on the merits by state courts). This deference extends not only to express findings of fact, but also to any implicit findings of the state court. *Garcia*, 454 F.3d at 444–45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005)).

A decision by a state court is "contrary to" the Supreme Court's clearly established law if it "applies a rule that contradicts the law set forth in" the Supreme Court's cases. *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas corpus court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Rather, that application must be objectively unreasonable. *Id.* at 409. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the decision. *Richter*, 562 U.S. at 87 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *see Johnson v. Williams*, 568 U.S. 289, 293 (2013) (holding there is a rebuttable presumption that the federal claim was adjudicated on the merits when the state court addresses some claims, but not others, in its opinion).

"In Texas writ jurisprudence, usually a denial of relief rather than a 'dismissal' of the claim by the Court of Criminal Appeals disposes of the merits of a claim." *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *see also Henderson v. Cockrell,* 333 F.3d 592, 598 (5th Cir. 2003); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (holding a "denial" signifies an adjudication on the merits while a "dismissal" means the claim was declined on grounds other than the merits).

Thus, a state application that is denied without written order by the TCCA is an adjudication on the merits, which is entitled to a presumption of correctness. *See Singleton*, 178 F.3d at 384; *Ex parte Torres*, 943 S.W.2d at 472. Where the decision is a summary denial or affirmance, however, a "federal [habeas] court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning."[7] *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

In addition to the standard of review imposed by the AEDPA, the petitioner must also show that any constitutional error had a "substantial and injurious effect or influence" on the verdict to be entitled to habeas relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The Supreme Court explained that, while the passage of the AEDPA "announced certain new conditions to [habeas] relief," it did not supersede or replace the harmless error standard announced in *Brecht. Brown v. Davenport*, 596 U.S. 118, 134 (2022). In other words, a habeas petitioner must also satisfy *Brecht*, even if the AEDPA applies. *See id.* ("[A] federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests.") (emphasis in original).

Additionally, federal habeas relief is foreclosed if a claim: (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722 (1991); or (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989).

---

[7] The Director may rebut this presumption by showing that the most recent state court's unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were argued or supported by the record that the state court reviewed. *See Wilson*, 584 U.S. at 125–26; *Wesson v. Dir., TDCJ-CID*, No. 1:19-CV-00187-H, 2022 WL 3928513, at *3 (N.D. Tex. Aug. 30, 2022), *appeal dismissed sub nom. Wesson v. Lumpkin*, No. 22-10990, 2023 WL 2881423 (5th Cir. Mar. 10, 2023).

Thus, the federal writ serves as a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102.

## IV. ANALYSIS

Petitioner's claims all concern allegations of ineffective assistance of counsel. A petitioner who seeks to overturn his conviction on the grounds of ineffective assistance of counsel must prove entitlement to relief by a preponderance of the evidence. *James v. Cain*, 56 F.3d 662, 667 (5th Cir. 1995). Ineffective assistance of counsel claims are governed by the Supreme Court's standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* provides a two-pronged standard, and the petitioner bears the burden of proving both prongs. *Id.* at 687.

Under the first *Strickland* prong, the petitioner must show counsel's performance was deficient. *Id.* To establish deficient performance, he must show "counsel's representation fell below an objective standard of reasonableness," with reasonableness examined under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688, 690 (noting that counsel's performance is "viewed as of the time of counsel's conduct"). The *Strickland* court further explained:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Id.* at 689 (internal citations omitted). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). The deficiency prong of *Strickland* is judged by counsel's conduct under the law existing at the time of the conduct. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993); *Westley v. Johnson*, 83 F.3d 714, 723 (5th Cir. 1996).

Under the second prong of the *Strickland* test, the petitioner must show his attorney's deficient performance resulted in prejudice. *Id.* at 687. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either. *Id.* at 697.

In addition to applying the *Strickland* two-prong test, a federal habeas court must review a state petitioner's ineffective assistance of counsel claim "through the deferential lens of [28 U.S.C.] § 2254(d)." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). Reviewing Petitioner's ineffective assistance of counsel claim through the lens of the AEDPA means that he has a higher bar to exceed in order to prevail. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by

10

*Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). Moreover, unreasonableness under *Strickland* and under § 2254(d) are not the same. First, "[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id.* Second, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* The court must consider not only whether the state court's determination was incorrect, but also "whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Thus, in light of the deference accorded by § 2254(d), "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101.

### A.  Ineffective Assistance of Trial Counsel During Guilt-Innocence Phase (Ground 1)

In his first ground for relief, Petitioner contends that he received ineffective assistance of counsel during the guilt-innocence phase of trial when trial counsel (1) failed to object to and elicited inadmissible and prejudicial testimony and (2) failed to request defensive jury instructions.

#### 1.  Failure to Object to, and Elicitation of, Inadmissible and Prejudicial Testimony

Petitioner asserts that trial counsel provided ineffective assistance when he failed to object to and elicited inadmissible and prejudicial testimony. (Dkt. #2 at 6, 7; Dkt. #15 at 46–84).

A failure to object does not constitute deficient representation unless a sound basis exists for objection. *See Roberts v. Thaler*, 681 F.3d 597, 611 (5th Cir. 2012) ("[C]ounsel is not required to make futile motions or objections.") (quoting *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990)); *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) (stating that failure to make frivolous

objections does not cause counsel's performance to fall below an objective level of reasonableness); *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997) (stating that a futile or meritless objection cannot be grounds for a finding of deficient performance); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."). Even with a sound basis, however, an attorney may render effective assistance despite a failure to object when the failure is a matter of trial strategy. *See Burnett v. Collins*, 982 F.2d 922, 930 (5th Cir. 1993) (noting that a failure to object may be a matter of trial strategy as to which courts will not second guess counsel).

### a. *Failure to object to improper opinion testimony as to the complainants' credibility*

Petitioner argues that trial counsel failed to object to improper opinion testimony regarding the credibility of the complainants M.C. and H.B. (Dkt. #2 at 7; Dkt. #15 at 49–57). Specifically, he contends that Lisa Martinez, a forensic interviewer with the Children's Advocacy Center, and H.B.'s mother, J.B., improperly testified without objection as to the complainants' credibility. (Dkt. #15 at 55).

<u>Martinez's testimony</u>

During the State's direct examination of Martinez, a forensic interviewer with the Children's Advocacy Center, an exchange occurred outside the presence of the jury between the State, trial counsel, and the trial court regarding what the State was expecting to ask Martinez relating to M.C.'s forensic interview. (Dkt. #26-9 at 167–68). After the trial court noted that M.C. had already testified and that the jury could judge her credibility, the State asked whether it could ask Martinez about coaching. (Dkt. #26-9 at 169). The State explained that the defense had already brought up coaching in its cross-examination of another witness. (Dkt. #26-9 at 169–70). The trial

12

court stated that it would "probably allow [the State] to ask [Martinez] if during her interview [of M.C.] . . . she felt like [M.C.] was being coached." (Dkt. #26-9 at 170). Trial counsel then questioned whether he had insinuated that someone had been coached, and the trial court responded, "Yes, by saying this is all an effort by Carla Mullendore to bring down a competitor, et cetera, so yes." (Dkt. #26-9 at 170). The trial court eventually moved the discussion to chambers. (Dkt. #26-9 at 170).

When the jury returned, Martinez testified that she was trained to look for signs of coaching during forensic interviews and informed the jury what those signs were. (Dkt. #26-9 at 172–73). She testified that, throughout her interview of M.C., she did not see any signs of coaching or "vindictiveness or anything that appeared where [M.C.] was on some sort of a mission against [Petitioner]." (Dkt. #26-9 at 172–73).

Petitioner asserts that trial counsel rendered ineffective assistance by failing to object to Martinez's testimony. He raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 67–68; Dkt. #24-8 at 17; Dkt. #28-5 at 93). At the evidentiary hearing, trial counsel testified that he believed her testimony would have been allowed even had he objected. (Dkt. #28-8 at 71–72).

The state habeas trial court found that trial counsel was an officer of the court, well known to the court, and credible, and that his testimony was credible. (Dkt. #24-5 at 179, ¶¶ 1–2). After setting forth the *Strickland* standards (Dkt. #24-5 at 179, ¶ 3), the court issued the following findings and conclusions relevant to Petitioner's claim:

> 27. Applicant argues that trial counsel was ineffective for failing to object to improper testimony that the victims were credible. According to Applicant, the complained-of testimony constituted improper bolstering;
>
> 28. In order to succeed with an ineffective-assistance-of-counsel claim based on counsel's failure to object, one "must show that the trial judge would have

13

committed error in overruling such objection." *Ex parte Parra*, 420 S.W.3d at 824-25;

29. Applicant first argues that counsel should have objected to Lisa Martinez's testimony;

30. At trial, Martinez, a forensic interviewer, testified that she is trained to look for signs of coaching during the forensic interview and informed the jury what those signs are; she did not see any of those signs in MC's interview. 9 RR 172-73;

31. In the jurisdiction in which this trial took place, an expert's opinion on signs of coaching or manipulation may assist the trier of fact and is admissible. *See Granados v. State*, Nos. 05-17-01301 CR & 05-17-01302-CR, 2019 WL 1349510, at *l (Tex. App.-Dallas Mar. 26, 2019, no pet.) (not designated for publication). Here, Martinez was an expert on forensic interviews based on her education, training, and experience. Tex. R. Evid. 702; 9 RR 150-56;

32. Martinez's testimony was admissible;

33. Applicant has failed to prove by a preponderance of the evidence that the trial court would have erred in overruling an objection to this testimony as an improper comment on the victim's credibility or as bolstering[.]

(Dkt. #24-5 at 184–85). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. The state court found that Martinez's complained-of testimony was admissible under Texas law. *See, e.g.*, *Schutz v. State*, 957 S.W.2d 52, 73 (Tex. Crim. App. 1997) (holding that a social worker's testimony that the victim did not exhibit signs of manipulation did not constitute a direct comment on the truth of the victim's statements); *Granados v. State*, No. 05-17-01301-CR, 2019 WL 1349510, at *1 (Tex. App.—Dallas Mar. 26, 2019) (holding that the trial court did not abuse its discretion by allowing an expert witness to testify that she did not see "red flags" indicating coaching and lying

when she interviewed the complainants); *Munoz v. State*, No. 05-16-00153-CR, 2017 WL 1684633, at *3 (Tex. App.—Dallas May 2, 2017) (holding that the trial court did not abuse its discretion by overruling an objection to a clinical therapist's testimony that therapy sessions did not raise any "red flags" that she was trained to look for when determining whether a complainant was lying or exaggerating); *Rangel v. State*, No. 05-15-00609-CR, 2016 WL 3031378, at *2 (Tex. App.—Dallas May 19, 2016) (holding that a forensic interviewer's testimony that she did not see "red flags" that a complainant had been manipulated or coached was not a direct comment about the complainant's truthfulness); *Vasquez v. State*, No. 05-11-01096-CR; 2012 WL 3125171, at *4 (Tex. App.—Dallas Aug. 2, 2012) (holding that the trial court did not abuse its discretion by overruling an appellant's objection and allowing the forensic interviewer to answer questions about whether she observed "red flags"). This Court cannot review the admissibility of the evidence, as it does not reconsider issues of state law in a § 2254 proceeding. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."); *Estelle*, 502 U.S. at 67–68) ("[I]t is not the province of a federal habeas corpus court to reexamine state-court determinations on state-law questions."); *Charles v. Thaler*, 629 F.3d 494, 500-501 (5th Cir. 2011) (noting that federal courts lack authority to review a state court's interpretation of its own state law in a federal habeas proceeding); *Young v. Dretke*, 356 F.3d 616, 628 (5th Cir. 2004) (declining to review the state habeas court's determination of the validity of a Texas statute under the Texas constitution in the context of a *Strickland* claim); *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) (stating that a federal habeas court "does not sit to review the mere admissibility of evidence under state law"); *Gibbs v. Johnson*, 154 F.3d 253, 259 (5th Cir.

15

1998) ("As a federal court in a habeas review of a state court conviction, we cannot review state rulings on state law.").

Because the state court found that Martinez's complained-of-testimony was admissible under Texas law and that the trial court would not have erred in overruling an objection to the testimony on the basis that it was an improper comment on M.C.'s credibility, it concluded that Petitioner was not prejudiced by trial counsel's failure to object to the testimony. *See Emery*, 139 F.3d at 198 (stating that counsel is not ineffective for failing to make a meritless objection). The state court's application of *Strickland* was reasonable. The state court applied the appropriate law, and the finding was based on a reasonable determination of the facts in light of the evidence presented in the state court proceeding. The state court record confirms that Martinez did not testify that M.C. was truthful or whether the sexual offenses happened; rather, she testified that M.C. did not exhibit signs of coaching during her forensic interview, as permitted by Texas law.

Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

J.B.'s testimony

On direct examination, H.B.'s mother, J.B., testified that, at some point in 2011, after H.B. had returned home from an appointment with Petitioner, H.B. asked if Petitioner was allowed to touch her "down there" and pointed to her groin area. (Dkt. #26-9 at 210-11). H.B. then told J.B. that Petitioner had touched her "down there" and pointed to her pelvic region. (Dkt. #26-9 at

213). J.B. stated that, after H.B.'s revelation, she took H.B. back to see Petitioner (Dkt. #26-9 at 217), explaining that H.B. did not tell her anything else at the time that gave her concern about taking H.B. back to treat with Petitioner. (Dkt. #26-9 at 218–19).

On cross-examination, J.B. explained that, after speaking with H.B. that evening, she was, "at that time," "at peace with the idea that there was nothing sexual going on at [Petitioner's] office in relation to [H.B.]" (Dkt. #26-9 at 227–28). Trial counsel elicited testimony from J.B. that she did not initially believe anything sexual had occurred; that she did not mention any "sexual aspect of it" to her husband; that she did not take any further action; that she did not take her teenage daughters to a different doctor; and that she did not ask Petitioner "to explain his actions and why they made [H.B.] uncomfortable." (Dkt. #26-9 at 226–28). Trial counsel also elicited testimony from J.B. that her "hindsight" and "perspective" changed when Detective Davis, who investigated the case, called her and she realized that Petitioner was going to be charged with sexual assault. (Dkt. #26-9 at 246–47). Trial counsel then asked whether her perspective changed because of what she had learned about the reaction of the community or by the police department. (Dkt. #26-9 at 247). J.B. said that the question was unfair, and the State asked her for clarification on redirect. (Dkt. #26-9 at 247, 249–50). In response, J.B. testified that when Detective Davis called her about the allegations against Petitioner, she "knew immediately right then and there. It was like the shades went off. I just knew it all had to be true just knew that that it all had to be true." (Dkt. #26-9 at 250).

On redirect examination, the State asked J.B. whether she believed her initial "intuition" "was wrong." (Dkt. #26-9 at 250). Trial counsel objected as "invading the province of the jury," but the trial court overruled the objection. (Dkt. #26-9 at 250). During a bench conference outside

17

of the presence of the jury, the State explained that it was going to ask J.B. why she believed H.B. now. (Dkt. #26-9 at 257). Trial counsel stated that he had no objection, and the trial court responded, "Well, that's good because I was going to let it in." (Dkt. #26-9 at 257). Back in front of the jury, J.B. testified that she changed her mind about the situation when Detective Davis informed her that at H.B.'s forensic interview, H.B. stated that Petitioner had "touched her inside of her underpants" and rubbed her "genitals or her private parts." (Dkt. #26-9 at 260). J.B. stated that the information was different than the information that she "had previously when [she] spoke with [H.B.]" (Dkt. #26-9 at 260). When the State asked her why she believed H.B. when she had never seen the forensic interview, J.B. responded:

> Because I -- I believe my daughter. I believe that she would not make this up. I don't see a reason why she would make something like this up when she stood to lose her relationship with Ms. Suzan, with [Petitioner], with all of her friends at the dance studio. I really and truly do not understand why she would lie about something. Why would she -- why would she give all of this up?

(Dkt. #26-9 at 260–61).

On re-cross examination, trial counsel elicited testimony that J.B. was unaware of certain details of H.B.'s forensic interview and that, at the time of trial, H.B. still attended Petitioner's girlfriend's dance studio (Taylor Dance Studio). (Dkt. #26-9 at 262–65).

Petitioner asserts that trial counsel rendered ineffective assistance by failing to object to J.B.'s testimony regarding the credibility of H.B. He raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 68; Dkt. #24-8 at 17; Dkt. #28-5 at 93). At the evidentiary hearing, trial counsel testified that "strategically" he did not believe he needed to object to the opinion testimony that the complainants were credible because he thought that "there was plenty of evidence that showed otherwise." (Dkt. #28-8 at 85–86). Trial counsel explained that the defense

18

had its "own arsenal as the trial developed to be able to attack" witnesses' opinions that the complainants were credible (Dkt. #28-8 at 86) and that he "had ample opportunity to attack those opinions with our own [defense] evidence that was going to be developed throughout the course of the trial." (Dkt. #28-8 at 87–88).

The state habeas trial court found that trial counsel was an officer of the court, well known to the court, and credible, and that his testimony was credible. (Dkt. #24-5 at 179, ¶¶ 1–2). After setting forth the *Strickland* standards (Dkt. #24-5 at 179, ¶ 3), the court issued the following findings and conclusions relevant to Petitioner's claim:

> 34. Applicant argues that trial counsel should have objected to H.B.'s mother's testimony that she "knew immediately right then and there. It was like the shades went off. I just knew it all had to be true" and "I believe my daughter. I believe she would not make this up. I don't see a reason why she would make something like this up when she stood to lose her relationship with Ms. Suzan, with [Applicant], with all of her friends at the dance studio. I really and truly do not understand why she would lie about something. Why would she-why would she give all of this up?" 9 RR 260;

> 35. Trial counsel testified that he did not want to waste time objecting to this testimony because he knew he was going to come back and attack those opinions. Writ RR 72-73;

> 36. After the complained-of testimony, trial counsel elicited testimony from H.B.'s mother that even though the allegations had been made, H.B. did still attend classes at the dance studio. 9 RR 264-65. Counsel also questioned H.B.'s mother about why she suddenly believed the allegations after talking to the detective. 9 RR 262-63;

> 37. Prior to the complained-of testimony, trial counsel questioned her about why she would take her daughter back to see Applicant after her initial allegation and the fact that she had not talked about the allegations H.B. made in her forensic interview. 9 RR 254-55;

> 38. Counsel attacked H.B.'s mother credibility regarding why she suddenly believe[d] that something sexual in nature had occurred when obviously she had not prior to the forensic interview, but she had not seen the interview and was not aware of the exact content of the interview;

39. Trial counsel's strategy in not objecting but seeking to attack the witness's credibility on his cross-examinations was valid legal strategy;

40. Applicant has failed to prove by a preponderance of the evidence that this strategy was deficient and that he was prejudiced by the alleged deficiency[.]

(Dkt. #24-5 at 185–86). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. The state court thoroughly reviewed the record, and applying the *Strickland* standard, concluded that trial counsel made a reasonable strategic decision not to object to J.B.'s opinion testimony as to the credibility of her daughter, H.B., but to attack J.B.'s opinion testimony on cross-examination. Petitioner has failed to show that the state court's application of the *Strickland* standard was unreasonable. The state court applied the appropriate law, and the finding was based on a reasonable determination of the facts in light of the evidence presented in the state court proceeding. The state court record confirms that trial counsel elicited testimony from J.B. that initially she did not believe that Petitioner did anything inappropriate and, therefore, did not act on H.B.'s allegation. Trial counsel also elicited testimony from J.B. that, after H.B.'s allegation, she continued to take her daughters to Petitioner for treatment and that H.B. still attended classes at Petitioner's girlfriend's dance studio. He attacked J.B.'s credibility about why she suddenly believed Petitioner had done something sexual to H.B. after the forensic interview, even though she did not know the content of the forensic interview. Furthermore, the trial court indicated that it was going to allow J.B. to testify as to why she believed H.B.'s allegations. (Dkt. #26-9 at 257).

20

Trial counsel reasonably could have determined that the trial court would have overruled any objection and allowed J.B. to testify as she did. Petitioner has not overcome the presumption that trial counsel's decision not to object to J.B.'s testimony but to attack her credibility on cross-examination was reasonable trial strategy.

Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

### b.   *Failure to object to references to the complainants as "victims"*

Petitioner contends that trial counsel provided ineffective assistance by failing to object to improper references to the complainants as "victims" and by referring to the complainants as "victims" in his opening statement. (Dkt. #2 at 7; Dkt. #15 at 49–54).

Before trial, trial counsel requested that the trial court instruct the State and its witnesses not to refer to the complainants as "victims" but rather as "alleged victim[s] or complainant[s]." (Dkt. #26-5 at 28). The trial court denied the request, noting that they are named as victims in the indictments, but warned the State not to "take it too far." (Dkt. #26-5 at 28–29).

Petitioner points to two State witnesses who improperly referred to the complainants as victims without objection from trial counsel: Detective Davis and Janette Michaels, senior vice president of the Children's Advocacy Center. Petitioner also asserts that the State improperly referred to the complainants as "victims" during opening statement and closing argument,

without objection from trial counsel. Additionally, Petitioner argues that trial counsel improperly referred to the complainants as "victims" in his opening statement. (Dkt. #15 at 49–50).

On direct examination, Detective Davis explained that forensic interviews are held at the Collin County Children's Advocacy Center and that they "are required to watch the forensic interviews of the victims that come in for our city." (Dkt. #26-7 at 317–18). Detective Davis used the term "victims" when referring to the complainants approximately eight times during her entire testimony. (Dkt. #26-7 at 330; Dkt. #26-8 at 8, 38, 100, 113, 164). In addition, Michaels testified on direct examination as to the differences between her interview and Detective Davis's interview with H.B., explaining that "Detective Davis did a law enforcement interview of a victim which is different in very specific ways." (Dkt. #26-9 at 319).

During its opening statement, the State referred to the complainants as "victims" on one occasion. (Dkt. #26-7 at 288 ("[T]he only two people in this case that are really related victim-wise are [H.B.] and [M.C.]")). And during closing argument, the State referred to the complainants as "victims" three times. (Dkt. #26-12 at 241, 285, 288). Trial counsel also used the term "victims" in his opening statement. (Dkt. #26-7 at 292 (arguing that the State "will not be able to produce a single shred of evidence that confirms any of these five victims were ever sexually molested by David Russell"); Dkt. #26-7 at 293 (referring to the complainants as "alleged victims" and reframing of the State's theory that it was "up to" Petitioner to decide "where he preys upon his victims" and then emphasizing that in Petitioner's office, in the middle of the day with everyone being able to see what was going on, was an "odd spot" to choose)).

Petitioner asserts that trial counsel provided ineffective assistance when he failed to object to references to the complainants as "victims" and when he referred to the complainants as

22

"victims" in his opening statement. He raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 63–65; Dkt. #24-8 at 17; Dkt. #28-5 at 93). At the evidentiary hearing, trial counsel noted that he had made a pre-trial oral motion in limine that the complainants not be referred to as "victims." (Dkt. #28-8 at 48). He stated that he did not object to Detective Davis's use of the term "victims," "which was literally in the opening minutes of her testimony as the first witness in the trial," because he wanted to connect with the jury and the jury to connect with Petitioner. (Dkt. #28-8 at 75–76). He explained:

> [T]here are moments to object strategically and there are moments to sit down and keep your mouth shut and fight bigger fights at a later time. But when you have got a case of this nature, these kinds of allegations, these are not robots sitting in the jury box; and I have to make decisions on the fly, at times, based on feel, experience, and expertise in this field as to when to object and when not to from a much bigger picture standpoint.

(Dkt. #28-8 at 76). Trial counsel also explained why he did not request a running objection to the use of the term "victims":

> I know in this particular situation, I had made an objection to Judge Roach prior to the trial. My experience with him, over the years that I have tried cases in front of him, was he did not want me bringing this issue up over and over again. It had been ruled on. And the last thing I want to do at the beginning of the trial is have the judge dress me down and embarrass me in front of the jury or talk down to me in front of the jury, that I am trying to convince my client didn't commit these crimes. Strategically, I decided when to object and when not to and when we believed it was important and when it wasn't.
>
> . . . .
>
> I believe the judge had already spoken to that issue and I was respecting his decision.

(Dkt. #28-8 at 78). He reiterated that "from a strategic standpoint" he did not make a running objection because he "didn't want the jury to hate" him or Petitioner. (Dkt. #28-8 at 78–80). Trial

23

counsel further explained why he did not object to Detective Davis's initial use of the term "victims":

> At that time, the case had just gotten started. We had just started testimony. We had yet to get into any of -- I believe any of the testimony from the actual complainants. I had yet to get a full read on the jury; what they wanted to hear, what they didn't want to hear. I didn't want to risk starting off on the wrong foot with the trial judge on an issue that had already been ruled on.
>
> So that is just a couple of the two or three things, as I sit here now, nine or ten years later -- nine years later as to why I wouldn't have objected at that point. The issue had already been dealt with and I wanted to save the ammunition that may be needed from an objection standpoint or an admission standpoint of evidence for some other battle as they were coming over the course of a week-or-two-week trial.
>
> So from a strategy standpoint, as a trial lawyer, with hundreds of jury trials, I have a feel for when I need to object and when I don't, and when it has been effective and when it hasn't. And at that point, I did not see the need to jump up within the first few answers given by this detective and object to the word "victim" without getting a true read or feel with how my jury or how this jury was going to react to certain situations. And that's why strategically it would have perhaps been decided that way.

(Dkt. #28-8 at 81–82).

The state habeas trial court found that trial counsel was an officer of the court, well known to the court, and credible, and that his testimony was credible. (Dkt. #24-5 at 179, ¶¶ 1–2). After setting forth the *Strickland* standards (Dkt. #24-5 at 179, ¶ 3), the court issued the following findings and conclusions relevant to Petitioner's claim:

> 5. Applicant argues that trial counsel was ineffective because he did not object to the use of the word "victim" by two of the State's witnesses;
>
> 6. In order to succeed with an ineffective-assistance-of-counsel claim based on counsel's failure to object, one "must show that the trial judge would have committed error in overruling such objection." *Ex parte Parra*, 420 S.W.3d 821, 824-25 (Tex. Crim. App. 2013);
>
> 7. Several courts have held that defense counsel was not ineffective for failing to object to the prosecutor's or witness's use of the word "victim." *See Gonzalez v.*

24

*State*, 510 S.W.3d 10, 31-32 (Tex. App.-Corpus Christi 2014, pet. ref'd); *Weatherly v. State*, 283 S.W.3d 481, 486 (Tex. App.-Beaumont 2009, pet. ref'd); *Cano v. State*, No. 14-06-00377-CR, 2007 WL 2872418, at \*8 (Tex. App.-Houston [14th Dist.] Oct. 4, 2007, pet. ref'd) (not designated for publication); *Byler v. State*, No. 03-01-00012-CR, 2002 WL 347753, at \*3 (Tex. App.-Austin Mar. 7, 2002, pet. ref'd) (not designated for publication);

8. Applicant has failed to direct this Court to any Texas case law that says that the use of the word "victim" by the State or its witnesses is improper;

9. Applicant relies on *Talkington v. State*, 682 S.W.2d 674 (Tex. App.-Eastland 1984, no pet.) for his claim that referring to the complaining witness as "victim" is reversible error. But that case did not involve references made by the State or its witnesses. In *Talkington*, the Court of Appeals held that references to "victim" by the trial court in its jury charge was an improper comment on the weight of the evidence. *Id.* at 675;

10. *Talkington* is wholly inapplicable to the claim raised;

11. Applicant has failed to prove by a preponderance of the evidence that the trial court would have erred in overruling any objection to the State or its witnesses' use of the word "victim[.]"

. . . .

21. Applicant claims that counsel was ineffective for referring to the complaining witnesses as "victims" during his opening statement to the jury. According to Applicant, trial counsel's "repeated references" to victims was akin to conceding Applicant's guilt;

22. Applicant's claim is not supported by the record;

23. Applicant does not cite to the portions of the record that show that counsel repeatedly referred to victims during his opening statement;

24. This Court has found two references. One of trial counsel's references was to "alleged victims," which can under no circumstances be considered a concession of guilt as Applicant alleges. 7 RR 293. The second reference is during counsel's reframing of the State's theory that it was up to Applicant to decide "where he preys on his victims" and that in Applicant's office, in the middle of the day with everyone being able to see what was going on was an odd spot to choose. 7 RR 293;

25. This was not a concession of guilt, but an attack on the logic of the State's theory;

25

26. Applicant has failed to prove by a preponderance of the evidence that counsel was deficient in using the word "victims" and that he was prejudiced by the alleged deficiency[.]

(Dkt. #24-5 at 180–81, 183–84). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. The state court found that it was not improper under Texas law[8] for the State or its witnesses to use the term "victims" and cited numerous Texas cases that have held that counsel is not ineffective for failing to object to the State's or its witnesses use of the term "victims." The state court further found that Petitioner's reliance on *Talkington v. State*, 682 S.W.2d 674 (Tex. App. 1984), was misplaced, because unlike in *Talkington*, the trial court here did not refer to the complainants as "victims" in the court's charge. Because the state court found that the State's and its witnesses' use of the term "victims" was not improper, it concluded that the trial court would not have erred in overruling an objection to these references. As such, the state court implicitly concluded that Petitioner was not prejudiced by trial counsel's failure to object. The state court's application of *Strickland* was reasonable. Petitioner cites no federal cases, and this Court has found none, holding that trial counsel's failure to object to the use of the term constituted deficient performance or resulted in prejudice or unfairness at trial. Furthermore, the trial court denied trial counsel's pre-trial motion in limine that the complainants not be referred to as "victims." Based on the trial court's ruling

---

[8] Petitioner's reliance on Vermont and Connecticut cases is misplaced as they are not binding on this Court or Texas state courts.

and Texas law, trial counsel could have reasonably determined that the trial court would have overruled any further objection to the use of the term "victim," which was used sparingly over a six-day trial. Petitioner has failed to prove that trial counsel's decision not to object was not trial strategy. Moreover, he has not shown that trial counsel performed deficiently, or that there is a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

The state court also found that Petitioner failed to prove that trial counsel was deficient in using the word "victims" and that he was prejudiced by the alleged deficiency. The state court's application of *Strickland* was reasonable. Trial counsel used the term twice in opening statement, and when read in context, the instances did not equate to telling the jury that the complainants were in fact victims, thereby conceding Petitioner's guilt. The state court applied the appropriate law, and the finding was based on a reasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

### c. *Elicitation of opinion testimony that Petitioner was guilty*

Petitioner further argues that trial counsel provided ineffective assistance by eliciting improper testimony from Detective Davis that Petitioner committed offenses and that he was guilty. (Dkt. #2 at 7; Dkt. #15 at 52–54).

27

On cross-examination of Detective Davis, trial counsel asked whether at the time she prepared the affidavit for Petitioner's arrest, she believed that a first-degree felony of aggravated sexual assault of a child (H.B.) had taken place, and she responded in the affirmative. (Dkt. #26-8 at 77). Immediately thereafter, trial counsel elicited testimony that H.B. had said that no penetration had occurred and that Petitioner was clear in his police interview that he never penetrated anyone in his office, including H.B. (Dkt. #26-8 at 77, 83).

Later, on recross-examination, trial counsel asked Detective Davis again about what she relied on in getting an arrest warrant regarding the sexual offenses against H.B. (Dkt. #26-8 at 181–82). After Detective Davis confirmed that one of the things she used to make an arrest determination was Petitioner's statements, trial counsel asked, "So there was stuff in [Petitioner's] interview that indicated to you as a detective that he had broken the law somehow; is that right?" (Dkt. #26-8 at 182). Detective Davis answered in the affirmative. (Dkt. #26-8 at 183). Trial counsel immediately emphasized that, during Petitioner's interview, he said that he "had never purposely touched a vagina" or "put his finger in any girl's vagina," and Detective Davis confirmed that neither statement amounted to an admission of "breaking the law." (Dkt. #26-8 at 183). Trial counsel then asked Detective Davis, "Did [Petitioner] make an admission or a confession on that interview that I have missed?" (Dkt. #26-8 at 183). Detective Davis responded, "No, he did not." (Dkt. #26-8 at 183). Trial counsel then segued into questions about the different standards of proof of probable cause and reasonable doubt. (Dkt. #26-8 at 183–84).

Petitioner asserts that trial counsel rendered ineffective assistance by eliciting the above-testimony from Detective Davis. He raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 65–67; Dkt. #24-8 at 17; Dkt. #28-5 at 93). At the evidentiary hearing, trial counsel

28

testified that his strategy was to "destroy" Detective Davis's credibility "in the eyes of the jury" and establish that she "made an arrest and charged [Petitioner] without sufficient evidence." (Dkt. #28-8 at 67–68).

The state habeas trial court found that trial counsel was an officer of the court, well known to the court, and credible, and that his testimony was credible. (Dkt. #24-5 at 179, ¶¶ 1–2). After setting forth the *Strickland* standards (Dkt. #24-5 at 179, ¶ 3), the court issued the following findings and conclusions relevant to Petitioner's claim:

> 4. The main defensive theory at trial was that any inappropriate touching was incidental, not intentional. Writ RR 38-39. To implement that theory, counsel's trial strategy was to attack the investigation, the lack of physical evidence, the lack of eyewitnesses despite the crowded office space, and the credibility of the victims. Writ RR 35-38, 76, 147;
>
> . . . .
>
> 12. Applicant claims that trial counsel was ineffective because he elicited Detective Davis's affirmative response to the question: "So there was stuff in [Applicant's] interview that indicated to you as a detective that he had broken the law somehow; is that right?" 8 RR 182. Applicant's argument appears to be that because this testimony would be improper bolstering if elicited by the State, it is equally improper for trial counsel to elicit;
>
> 13. Part of trial counsel's defensive strategy was to attack Detective Davis's investigation and her credibility. Writ RR 52-53;
>
> 14. Counsel testified that taking the entire context of this question and response, that question furthered his strategy by calling into question the investigation. Writ RR 52-53;
>
> 15. The trial record supports trial counsel's claim. Immediately prior to the complained-of exchange, trial counsel clarified that Detective Davis used evidence, including Applicant's statements in his interview, to get an arrest warrant. 8 RR 182. Then, immediately after Detective Davis confirmed that there was something in his interview that indicated to her that he had broken the law, trial counsel went through certain statements that Applicant had made to her—that he had never purposely touched a vagina, that he never put his finger in a girl's vagina, and did not make any admissions or confession. 8 RR 183. Counsel parlayed that exchange

29

into questions about the differences between probable cause and reasonable doubt. 8 RR 183-84. This concluded a very lengthy and thorough cross-examination of the detective;

16. When taken in context with the questions and responses around the isolated complained-of exchange, it is clear that trial counsel was seeking to show that Detective Davis had little evidence of Applicant's guilt at the time of the arrest warrant;

17. This was directly in line with trial counsel's valid strategy;

18. Applicant has failed to prove by a preponderance of the evidence that this strategy was deficient;

19. Counsel immediately reminded Detective Davis of some of the statements that Applicant had made and got her to admit that neither of those statements was an admission of anything that was against the law and that Applicant did not confess during his statement;

20. Applicant has failed to show by a preponderance of the evidence that he was prejudiced by the detective's admission that she believed Applicant had admitted some wrong-doing[.]

(Dkt. #24-5 at 179–80, 181–83). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. The state court thoroughly reviewed the record, and applying the *Strickland* standard, concluded that trial counsel made a reasonable strategic decision to attack Detective Davis's credibility on cross-examination by calling into doubt the investigation and that she had sufficient evidence to obtain an arrest warrant. Petitioner has failed to show that the state court's application of the *Strickland* standard was unreasonable. When Detective Davis's complained-of-testimony is read in context, it is evident that trial counsel was attempting to attack her investigation of the offenses and her

30

credibility. Petitioner has not overcome the presumption that trial counsel's cross-examination of Detective Davis was reasonable trial strategy. Moreover, the jury acquitted Petitioner of aggravated sexual assault of H.B. Thus, Petitioner has failed to demonstrate how he was prejudiced by trial counsel's cross-examination of Detective Davis regarding that specific charge.

Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

### d.  *Failure to object to inadmissible hearsay and improper opinion testimony from an unqualified, non-expert witness*

Next, Petitioner asserts that trial counsel provided ineffective assistance when he failed to object to Detective Davis's following testimony: (1) she learned from a chiropractic professor at Parker University[9] that a chiropractor should not intentionally touch or otherwise contact a patient's vagina during a procedure (Dkt. #26-8 at 17); (2) after checking with the Texas Board of Chiropractors, she determined that the "rules that govern chiropractors" state that there should not be any "sexual comments during the exam" and "there should be no touching of any sexual organs during the exams" (Dkt. #26-8 at 14, 18); and (3) in her opinion, a chiropractor cannot "by accident" touch a patient's vagina during treatment (Dkt. #26-8 at 66–67). (Dkt. #2 at 7; Dkt. #15 at 57–60).

On direct examination, the State asked Detective Davis about a conversation she had with a chiropractic professor and about the rules governing chiropractors. (Dkt. #26-8 at 14–15, 17–18).

---

[9] Petitioner graduated from Parker University. (Dkt. #26-8 at 14–15).

When the State asked Detective Davis, "did you learn whether there was -- through your investigation whether there is any type of procedures in regards to the groin and those types of injuries that the Defendant --," trial counsel objected based on hearsay. (Dkt. #26-8 at 15). The State argued that the out-of-court statements were being offered to show the reasons for Detective Davis's investigative steps, and therefore, they were being offered "for the effect on the listener and not for the truth of the matter asserted." (Dkt. #26-8 at 16). The trial court overruled the objection "for that limited purpose," and trial counsel requested a limiting instruction. (Dkt. #26-8 at 16). The trial court granted the request and instructed the jury as follows:

> Ladies and gentlemen of the jury, sometimes, like I mentioned in my instructions before we started, the Court will allow you to hear evidence for a limited purpose. This is one of those occasions.
>
> The testimony that the detective is going to give with regard to her investigation and comments made by other people are not introduced or offered to prove the truth of the matter asserted but instead are just showing the steps she took in pursuing her investigation and you are to consider it only for that limited purpose.

(Dkt. #26-8 at 16).

The first two instances of the complained-of testimony occurred directly after this limiting instruction. (Dkt. #26-8 at 17, 18). Specifically, Detective Davis testified (1) that she learned from a chiropractic professor that a chiropractor should not intentionally touch or otherwise contact a patient's vagina during a procedure (Dkt. #26-8 at 17); and (2) that after checking with the Texas Board of Chiropractors, she determined that the "rules that govern chiropractors" state that there should not be any "sexual comments during the exam" and that "there should be no touching of any sexual organs during the exams" (Dkt. #26-8 at 18). Detective Davis testified that this information led her to "retrieve[] a search warrant for Russell Chiropractic." (Dkt. #26-8 at 14, 17–18).

The third instance of complained-of testimony was elicited during trial counsel's cross-examination of Detective Davis. Trial counsel highlighted the fact that, during Petitioner's police interview, another detective agreed with Petitioner that "touching a vagina by accident when you are taping or doing some of this massage work or some of the work on the groin is kind of an unavoidable accident." (Dkt. #26-8 at 66). When trial counsel asked Detective Davis whether she agreed, she testified that she did not. (Dkt. #26-8 at 67).

Petitioner asserts that trial counsel rendered ineffective assistance by failing to object to the complained-of testimony. He raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 69–71; Dkt. #24-8 at 17; Dkt. #28-5 at 93). At the evidentiary hearing, trial counsel testified that his strategy was to discredit Detective Davis and attack her investigation. (Dkt. #28-8 at 88–91).

The state habeas trial court found that trial counsel was an officer of the court, well known to the court, and credible, and that his testimony was credible. (Dkt. #24-5 at 179, ¶¶ 1–2). After setting forth the *Strickland* standards (Dkt. #24-5 at 179, ¶ 3), the court issued the following findings and conclusions relevant to Petitioner's claim:

> 4. The main defensive theory at trial was that any inappropriate touching was incidental, not intentional. Writ RR 38-39. To implement that theory, counsel's trial strategy was to attack the investigation, the lack of physical evidence, the lack of eyewitnesses despite the crowded office space, and the credibility of the victims. Writ RR 35-38, 76, 147;
>
> . . . .
>
> 41. Applicant also argues that trial counsel was ineffective because he did not object to Detective Davis's testimony that she contacted the licensing board for chiropractors and learned that there should not be any sexual comments or touching of sexual organs during chiropractic examinations, and that she learned from a professor that there was no procedure that required touching the vagina and that contact should be avoided. 8 RR 17-18;

42. Applicant argues that trial counsel should have objected to Detective Davis's testimony that she did not agree with another detective's statement that touching a vagina while working on the groin is unavoidable. 8 RR 66-67;

43. Counsel is not ineffective for failing to object to the third complained-of testimony that Detective Davis did not agree with another detective's statement that touching a vagina while working on the groin is unavoidable;

44. This testimony was elicited by trial counsel during cross-examination, but Applicant's claim is that counsel was ineffective for failing to object to this testimony as inadmissible hearsay, not that counsel was ineffective for eliciting this testimony. App. Brief, pp. 37-38;

45. Applicant has failed to meet his burden of proof that counsel was ineffective for failing to object to Detective Davis's testimony that she learned there should not be any sexual comments or touching of sexual organs during chiropractic examinations, that there was no procedure that required touching the vagina, and that contact should be avoided;

46. When the State first asked Detective Davis, "did you learn whether there was through your investigation whether there is any type of procedure in regards to the groin and those types of injuries that the Defendant --", trial counsel objected to hearsay. 8 RR 15;

47. The trial court overruled the objection but limited the purpose of the testimony only to show the effects on the detective and why she took her next steps. 8 RR 16;

48. Counsel then requested a limiting instruction that was granted, and the trial court instructed the jury, "The testimony that the detective is going to give with regard to her investigation and comments made by other people are not introduced or offered to prove the truth of the matter asserted but instead are just showing the steps she took in pursuing her investigation and you are to consider it only for that limited purpose.";

49. Applicant has failed to prove by a preponderance of the evidence that counsel was deficient for not objecting to the line of questioning and obtaining a limiting instruction and that he was prejudiced by this alleged deficiency[.]

(Dkt. #24-5 at 179–80, 186–88). The TCCA subsequently denied relief without written order based

on the state habeas trial court's findings after a hearing and on its independent review of the record.

(Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. The state court thoroughly reviewed the record, and applying the *Strickland* standard, concluded that trial counsel's decision not to object to the complained-of-testimony did not amount to ineffective assistance. Petitioner has failed to show that the state court's application of the *Strickland* standard was unreasonable. Thus, the state court record confirms that, before the first two instances of the complained-of-testimony, trial counsel did in fact object to this line of inquiry and obtained a limiting instruction that Detective Davis's statements were not offered for the truth of the matter asserted, but to show how they affected the steps she decided to take in her investigation. Detective Davis's first two instances of the complained-of-testimony immediately followed that limiting instruction. Because the trial court determined that Detective Davis could testify as she did, and because the trial court had already provided a limiting instruction as to such testimony, trial counsel could have reasonably determined that any further objection to her testimony on the basis of hearsay would have been overruled. Trial counsel was not ineffective for failing to make a meritless objection. *See Emery*, 139 F.3d at 198.

Petitioner also asserts that trial counsel was ineffective for failing to object to Detective Davis's testimony that she disagreed with another detective's opinion that touching a vagina "by accident" while treating a groin injury is unavoidable. Petitioner argues that Detective Davis's opinion testimony was improper because she was not qualified as an expert. As noted by the state court, this testimony was elicited by trial counsel during Detective Davis's cross-examination and not by the State on direct examination. Thus, the Court understands Petitioner is arguing that trial counsel was ineffective for eliciting this testimony, rather than objecting to it. Regardless,

Petitioner has failed to establish that Detective Davis's disagreement with another detective's opinion amounted to expert testimony requiring qualification. Furthermore, Petitioner has not overcome the presumption that trial counsel's decision to discredit Detective Davis during cross-examination was strategic, as trial counsel testified to at the evidentiary hearing. Indeed, through cross-examination, trial counsel was able to emphasize that another detective believed that Petitioner's touching a vagina by accident during a chiropractic procedure on the groin was unavoidable, as Petitioner claimed. (Dkt. #26-8 at 67). Additionally, trial counsel challenged Detective Davis's questioning of Petitioner during his investigative interview as to this very issue, suggesting that she persistently questioned Petitioner simply because she "didn't like the answer" that Petitioner had given. (Dkt. #26-8 at 67). It is not the province of the courts to second guess counsel's cross-examination strategy because "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment." *Ford v. Cockrell*, 315 F. Supp. 2d 831, 859 (W.D. Tex. 2004), *aff'd*, 135 F. App'x 769 (5th Cir. 2005).

Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

e. *Elicitation of testimony that most abuse victims voluntarily return to their abusers*

Petitioner also argues that trial counsel provided ineffective assistance when he elicited on cross-examination of Martinez, a forensic interviewer with the Children's Advocacy Center, that an abused person usually voluntarily returns to her abuser. (Dkt. #2 at 7; Dkt. #15 at 60–66).

On cross-examination of Martinez, the following line of questioning occurred:

Q. Okay. With regard to normal behavior, normal patterns of an abused child or an abused person, does an abused person usually voluntarily return to their abuser?

A. That can happen, yes.

Q. Can happen?

A. That does happen.

Q. Does happen?

A. Does happen, yes.

Q. And does that happen frequently or infrequently?

A. I couldn't tell you. But most of the kids that I have interviewed, they do go back to the perpetrator.

Q. Okay. And when I say voluntarily, I mean take extreme measures to take themselves and put themselves back in the abusive situation.

A. When it is somebody that they know, love and trust, definitely, yes.

Q. Sure. Get on an airplane and fly to go see somebody that's been abusing them?

A. That does happen.

Q. It could happen. Certainly get in a car and drive to the abuser's house, place of business, wherever it is that they may?

A. Yes, sir.

Q. Normal behavior?

37

A. Yes.

Q. Normal to do it once?

A. It would be normal to do it any number of times. Because of the relationship, it is not just about the abuse but it is about the trust that you have with someone. It is kind of hard to -- it is not just a one-sided relationship.

Q. So there is not a number that you could put on abnormal behavior of people returning to an abuser?

A. No, sir.

Q. A hundred million times you would still say that's pretty normal behavior?

A. I wouldn't say that that's pretty normal. I would just say that that could happen.

Q. Well, anything could happen, of course.

A. Yes.

(Dkt. #26-9 at 179–80).

Petitioner asserts that trial counsel rendered ineffective assistance by eliciting testimony that most child-abuse victims voluntarily return to their abusers. He raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 71–76; Dkt. #24-8 at 17; Dkt. #28-5 at 93). At the evidentiary hearing, trial counsel testified that he asked Martinez whether an abused person usually voluntarily returns to her abuser because "in this circumstance" he believed that "either answer was going to be helpful to [the defense]." (Dkt. #28-8 at 91–92, 94). He explained that, based on his experience handling these types of case, if Martinez responded "yes, they return to their abuser," the jury would "look at her and go, what are you talking about, that doesn't make any rational sense." (Dkt. #28-8 at 92). Trial counsel further stated that, in his experience, in these types of cases, most jurors "think that an abused person would react to the abuse in a particular way" and that way is "to distance themselves from the abuse." (Dkt. #28-8 at 93). He stated, "the

38

idea would be that the jury would look at [a yes] answer as being outlandish, outrageous, ridiculous," and it would be a way to attack Martinez's credibility. (Dkt. #28-8 at 93, 95–96).

Trial counsel explained that, on the other hand, a "no" answer—meaning that Martinez did not "believe an abused person would go back to their abuser over and over again"—would "fit[] in even better for our own particular defensive strategy in this case." (Dkt. #28-8 at 94). Trial counsel also testified that a "prevalent theme" of the defense strategy was attacking the complainants' credibility by emphasizing that they "kept going back to see [Petitioner] for treatment," even after they claimed he was abusing them. (Dkt. #28-8 at 52–53, 93). When asked why he did not argue in closing that Martinez was not a credible witness because she gave an "incredible answer" "that abused kids go running back to their abusers," trial counsel explained that closing argument is time-restricted and "from a strategic standpoint, [he] must have made the decision on what to include and what not to include, what to emphasize, what to let stand on its own," and "strategically" he "decided not to go back to her testimony; instead, leave that impression with the jury." (Dkt. #28-8 at 96–97).

The state habeas trial court found that trial counsel was an officer of the court, well known to the court, and credible, and that his testimony was credible. (Dkt. #24-5 at 179, ¶¶ 1–2). After setting forth the *Strickland* standards (Dkt. #24-5 at 179, ¶ 3), the court issued the following findings and conclusions relevant to Petitioner's claim:

> 4. The main defensive theory at trial was that any inappropriate touching was incidental, not intentional. Writ RR 38-39. To implement that theory, counsel's trial strategy was to attack the investigation, the lack of physical evidence, the lack of eyewitnesses despite the crowded office space, and the credibility of the victims. Writ RR 35-38, 76, 147;
>
> . . . .

39

50. Applicant argues that trial counsel was ineffective because he elicited testimony that most child abuse victims voluntarily have contact with their abusers. According to Applicant, because there was no proof th[at] Martinez was an expert in this area, the State would not have been able to elicit the testimony, and thus, counsel was ineffective for eliciting this testimony;

51. Part of trial counsel's theory at trial was that the victims were not credible because they kept returning to Applicant for treatment even after the alleged sexual touching. Writ RR 37-38;

52. The following exchange occurred during trial counsel's cross-examination of the forensic interviewer, Lisa Martinez:

> Q. Okay. With regard to normal behavior, normal patterns of an abused child or an abused person, does an abused person usually voluntarily return to their abuser?
>
> A. That can happen, yes.
>
> Q. Can happen?
>
> A. That does happen.
>
> Q. Does happen?
>
> A. Does happen, yes.
>
> Q. And does that happen frequently or infrequently?
>
> A. I couldn't tell you. But most of the kids that I have interviewed, they do go back to the perpetrator.
>
> Q. Okay. And when I say voluntarily, I mean take extreme measures to take themselves and put themselves back in the abusive situation.
>
> A. When it is somebody that they know, love and trust, definitely, yes.
>
> Q. Sure. Get on an airplane and fly to go see somebody that's been abusing them?
>
> A. That does happen.

Q. It could happen. Certainly get in a car and drive to the abuser's house, place of business, wherever it is that they may?

A. Yes, sir.

Q. Normal behavior?

A. Yes.

Q. Normal to do it once?

A. It would be normal to do it any number of times. Because of the relationship, it is not just about the abuse but it is about the trust that you have with someone. It is kind of hard to -- it is not just a one-sided relationship.

Q. So there is not a number that you could put on abnormal behavior of people returning to an abuser?

A. No, sir.

Q. A hundred million times you would still say that's pretty normal behavior?

A. I wouldn't say that that's pretty normal. I would just say that that could happen.

53. Counsel asked Martinez this question with the idea that there was no correct answer for Martinez to give: if Martinez answered that it was uncommon, she would have helped prove the defensive theory and if she answered, as she did, that it was common, he could attack her credibility and expertise in this field by showing that it was, in fact, not common for victims to return to their abusers when they did not have to. Writ RR 76-83;

54. Either way Martinez answered the question, counsel would be able to use the answer in support of one of his defensive theories;

55. Applicant has not shown by a preponderance of the evidence that counsel's strategy in asking the question was deficient or that he was prejudiced by the alleged deficiency[.]

41

(Dkt. #24-5 at 179–80, 188–90). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. The state court thoroughly reviewed the record, and applying the *Strickland* standard, concluded that trial counsel's line of questioning did not amount to ineffective assistance. Petitioner has failed to show that the state court's application of the *Strickland* standard was unreasonable. As the state court found, trial counsel made a strategic decision to ask Martinez whether it was common for abuse victims to return to their abusers, because both a "yes" and a "no" answer supported the defense strategy. Petitioner has not overcome the presumption that trial counsel's strategic decision was reasonable in light of the defensive strategy. Moreover, Petitioner has failed to demonstrate that there is a reasonable probability that, but for trial counsel's unprofessional errors, the result of the proceeding would have been different.

Furthermore, trial counsel's decision not to argue in closing that Martinez's answer was incredible, outlandish, and ridiculous and instead "leave that impression with the jury" (Dkt. #28-8 at 93, 96–97) was a matter of trial strategy. There is a right to effective assistance by counsel during closing arguments. *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). "Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Id.* at 5–6. "Judicial review of a defense attorney's summation is therefore highly deferential—and doubly deferential when it is conducted through

42

the lens of federal habeas." *Id.* at 6. Petitioner has not overcome the presumption that trial counsel's strategic decision during closing argument was reasonable. Nor has he demonstrated that there is a reasonable probability that, but for trial counsel's unprofessional errors in closing argument, the result of the proceeding would have been different.

Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

### f. Failure to object to, and elicitation of, inadmissible extraneous offense testimony

Petitioner next contends that trial counsel provided ineffective assistance when he failed to object to and elicited inadmissible extraneous offense testimony. (Dkt. #2 at 7; Dkt. #15 at 67–69).

During cross-examination of Detective Davis, trial counsel asked whether Carla Mullendore had told her that she believed K.T., the daughter of Petitioner's girlfriend Suzan Taylor, "also may have been touched inappropriately by" Petitioner, and that Detective Davis should speak to K.T. and Taylor about the "situation." (Dkt. #26-8 at 102). Detective Davis responded, "That's correct." (Dkt. #26-8 at 102). Trial counsel then asked Detective Davis whether she made "any attempt to get in touch" with K.T., and Detective Davis testified that she made "plenty of phone calls" but was never able to contact her. (Dkt. #26-8 at 102). Trial counsel elicited testimony from Detective Davis that K.T.'s phone number was not in Detective Davis's notes and that any notes she had about trying to contact K.T., or her thoughts about K.T., were on a "sticky" that had been shredded. (Dkt. #26-8 at 102–04). Detective Davis admitted that "there

was potentially a victim" and she did not "have the evidence of how [she] even tried to come in contact with her." (Dkt. #26-8 at 104). On redirect, the State elicited testimony that Detective Davis became aware of K.T. "possibly being a victim" during M.C.'s forensic interview. (Dkt. #26-8 at 153). Later, on cross-examination of Mullendore, trial counsel elicited testimony that she had told Detective Davis "that she should probably contact" K.T. and Taylor to discuss the allegations. (Dkt. #26-8 at 232).

K.T. testified at trial. She explained that she felt uncomfortable when Petitioner treated her groin injury because his hands were close to her genitals, but she said that it was "nothing out of the ordinary" and that he did not penetrate her vagina. (Dkt. #26-12 at 85–87). K.T. also testified that Petitioner later explained "in detail" what he did to treat her groin, and she confirmed that after his explanation, she was "definitely" satisfied that the treatment was "normal." (Dkt. #26-12 at 88).

Petitioner also asserts that trial counsel improperly elicited the following extraneous offense testimony from M.H. during cross-examination:

> Q. And the detective also told you at that time that they were going to do everything they could to stick it to him, right?
>
> A. Right.
>
> Q. Because he had done this to lots of little kids, right?
>
> A. Right.
>
> Q. And that's what you were there for is because he did it to lots of little kids, correct?
>
> A. No.
>
> Q. Well, you told the detective right off the bat that when he asked you did he penetrate your vagina, you told him that he came very, very close, correct?

44

A. Yes.

Q. And that doesn't mean the answer was yes; the answer was very close is not penetration. Wouldn't you agree with that?

A. Yes.

Q. So originally you came in to tell the detective this is kind of disgusting, but really all I have got here is a Class C misdemeanor, right?

A. I was not sure.

Q. Well, I mean, you are certainly not an expert in criminal law. I mean, I wouldn't expect that you would know the difference between a, you know, Class C misdemeanor and a second degree felony; but what you told the detective at the beginning of the interview, in your own words, was he didn't penetrate me; is that right?

A. I don't recall those exact words.

Q. When he asked you whether or not he penetrated your vagina, you said very, very close?

A. Correct.

Q. I assume that means no, correct?

A. Yes.

Q. I am correct in that assumption; is that right?

A. Yes.

Q. That is what you originally told the officer and then y'all started talking about it a little bit further and your memory of the event actually changed, correct?

A. No.

Q. Well, I mean, it changed to say okay, yes, I guess he did penetrate me, if we are just talking about a Class C misdemeanor, as disgusting and vile as it was, now I guess I have got to say he penetrated me to make sure that the fullest extent of the law is used; isn't that correct?

45

A. No.

Q. And the officer, the detective in this interview, he helped you along, down that process, correct?

A. No.

Q. He wanted to make sure that we are going to stick it to David Russell, we are going to make sure that we bury him underneath the jail because of all of the things that he has done to all of these little kids; isn't that right?

A. No.

Q. That's what you were convinced of once you started talking in more detail to the detective, right?

A. No.

(Dkt. #26-9 at 347–49).

Petitioner argues that trial counsel rendered ineffective assistance by failing to object to and eliciting inadmissible extraneous offense testimony that Petitioner had sexually assaulted K.T. and that the police believed that Petitioner had committed sex offenses against "lots of little kids." He raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 77–78; Dkt. #24-8 at 17; Dkt. #28-5 at 93–94). At the evidentiary hearing, trial counsel testified that "part of [the defense] strategy was to find the holes and the problems in the initial investigation with regards to the case." (Dkt. #28-8 at 162). He stated that he elicited testimony that Petitioner may have committed a sex offense against K.T. because he was trying to impeach Detective Davis's "credibility and her thoroughness in her investigation that there were at least one, if not more, other potential complainants that she didn't even bother to talk to." (Dkt. #28-8 at 102–03). He further clarified that he did not consider K.T. to be a "complaining witness" but "a witness that the detective didn't even bother to contact" and that his "strategy was to attack the investigative methods of

the lead detective responsible for the arrest in this case." (Dkt. #28-8 at 103). Trial counsel agreed that he "could have elicited from Detective Davis simply that she failed to interview [K.T.]" without also eliciting that Mullendore believed that Petitioner had sexually abused K.T. (Dkt. #28-8 at 103), but he wanted to "attempt to show the jury that Detective Davis did a poor job in investigating not only this potential allegation but every other allegation involved in the case" (Dkt. #28-8 at 104). Trial counsel testified that he could not recall his strategy for eliciting testimony from H.M. that the police told her that Petitioner abused "lots of little kids." (Dkt. #28-8 at 107–08).

The state habeas trial court found that trial counsel was an officer of the court, well known to the court, and credible, and that his testimony was credible. (Dkt. #24-5 at 179, ¶¶ 1–2). After setting forth the *Strickland* standards (Dkt. #24-5 at 179, ¶ 3), the court issued the following findings and conclusions relevant to Petitioner's claim:

> 4. The main defensive theory at trial was that any inappropriate touching was incidental, not intentional. Writ RR 38-39. To implement that theory, counsel's trial strategy was to attack the investigation, the lack of physical evidence, the lack of eyewitnesses despite the crowded office space, and the credibility of the victims. Writ RR 35-38, 76, 147;
>
> . . . .
>
> 56. Applicant also argues that trial counsel was ineffective because he did not object to and elicited testimony that Mullendore believed Applicant ha[d] sexually abused his girlfriend's daughter, [K.T.];
>
> 57. One of trial counsel's strategies to was attack the detective's investigation. Writ RR 147·
>
> 58. During trial counsel's cross-examination of Detective Davis, he asked if Mullendore had also told her that [K.T.] may have also been inappropriately touched. 8 RR 102. Counsel then asked if she had attempted to get in touch with [K.T.], and that Detective Davis responded that she had. 8 RR 102. When counsel questioned her about why there were no notes in her file regarding her attempts to

47

contact [K.T.], the detective finally admitted that the notes could have been on a "sticky" that had been shredded. 8 RR 102-04;

59. This line of questioning helped counsel support his defensive theory and his strategy was valid;

60. Applicant has failed to prove by a preponderance of the evidence that counsel's strategy was deficient and that he was prejudiced by the alleged deficiency;

61. Applicant complains that trial counsel was ineffective because he elicited testimony from Mullendore that she told the police to investigate [K.T.];

62. During cross-examination Mullendore admitted that she told police they needed to talk with [K.T.] 8 RR 232;

63. This was in line with counsel's questioning of Detective Davis and supported his defensive theory that Detective Davis's investigation was sloppy;

64. Applicant has failed to prove by a preponderance of the evidence that counsel's strategy was deficient and that he was prejudiced by the alleged deficiency;

65. Applicant complains that trial counsel should have objected when Detective Davis testified on re-direct that she learned [K.T.] may be a possible victim;

66. Applicant claims that this was inadmissible extraneous evidence testimony;

67. There was nothing in Davis's testimony that indicated any allegations were alleged or that [K.T.] was a victim;

68. Counsel had already extensively questioned Detective Davis about hearing [K.T.] was a possible victim and not doing any follow-up investigation;

69. [K.T.] testified at trial;

70. She was uncomfortable during a treatment because his hands were close to her private area, but it was "nothing out of the ordinary," and he never penetrated her vagina. 12 RR 87. After she complained to her mother, Applicant explained in detail about the treatment, and she felt comfortable with it. 12 RR 88. He also told her about internal vaginal massage, telling her it was "a thing but that's not what he did" in his practice. 12 RR 89. He did not suggest doing an internal vaginal treatment on her. 12 RR89;

71. There was nothing to show that [K.T.]'s interaction with Applicant was an extraneous offense;

48

72. Applicant has not shown by a preponderance of the evidence that counsel was deficient for not objecting to Detective Davis's testimony that she learned [K.T.] was a possible victim and that he was prejudiced by the alleged deficiency;

73. Applicant also argues that trial counsel was ineffective because he elicited testimony from M.H. that police told her that Applicant had committed other offenses against "lots of little kids." According to Applicant this evidence misled the jury into thinking that he committed offenses against "lots" of children;

74. During cross-examination of M.H. by defense counsel, the following exchange occurred:

Q: "And the detective also told you at that time that they were going to do everything they could to stick it to him, right?"

A: "Right."

Q: "Because he had done this to lots of little kids, right?"

A: "Right."

Q: "And that's what you were there for is because he did it to lots of little kids, right?"

A: "No."

Q: "Well you told the detective right off the bat that when he asked you did he penetrate your vagina, you told him that he came very, very close, correct."

A: "Yes."

Q: "This is what you originally told the officer and then ya'll started talking about it a little bit further and your memory of the event actually changed, correct?"

A: "No."

Q: "And the officer, the detective in this interview, he helped you along, down that process, correct?

A: "No."

Q: "He wanted to make sure that we are going to stick it to David Russell, we are going to make sure we bury him beneath the jail because of all the things that he has done to all of these little kids, isn't that right?"

A: "No."

9 RR 347-49;

75. In asking M.H. this series of questions, trial counsel was clearly attempting to argue that M.H. changed her version of events from that she had not been penetrated to that she had been penetrated because the police had told her that Applicant had done something to little kids and she wanted to help put him away by accusing him of something greater than she originally had;

76. This was in line with counsel's defensive strategy of attacking the victim's credibility;

77. Applicant has failed to prove by a preponderance of the evidence that counsel's strategy was deficient and that he was prejudiced by the alleged deficiency[.]

(Dkt. #24-5 at 179–80, 191–94). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. The state court thoroughly reviewed the record, and applying the *Strickland* standard, concluded that trial counsel did not render ineffective assistance by not objecting to or eliciting the complained-of-testimony. Petitioner has failed to show that the state court's application of the *Strickland* standard was unreasonable. When the complained-of-testimony regarding K.T. is reviewed in context, it is evident that trial counsel was attempting to undermine Detective Davis's investigation into the allegations in this case by emphasizing that her investigation was incomplete and shoddy, as trial counsel testified at the evidentiary hearing. Petitioner has not overcome the presumption that trial

50

counsel's decision to attack Detective Davis's investigation was reasonable trial strategy. Furthermore, there was no evidence presented at trial that Petitioner committed an extraneous offense against K.T. She did not file allegations against Petitioner, and any suggestion that K.T. might have been a victim was contradicted by K.T.'s own testimony that Petitioner did not abuse her. Petitioner has failed to demonstrate that there is a reasonable probability that, but for trial counsel's unprofessional errors, the result of the proceeding would have been different.

Furthermore, the state court record confirms that during trial counsel's cross-examination of M.H., trial counsel was clearly attempting to attack her credibility by suggesting that she alleged penetration only after the detective told her that Petitioner had abused "lots of little kids." As the state court found, this approach furthered the defensive strategy of attacking the credibility of the complainants. Petitioner has not overcome the presumption that trial counsel's strategy of attacking M.H.'s credibility was reasonable. That at the evidentiary hearing trial counsel could not recall his strategy for eliciting this testimony from M.H. does not change the calculus. The state court found trial counsel's testimony that he could not recall his specific decision-making in this case to be credible, noting that the evidentiary hearing occurred nearly nine years after Petitioner's trial. (Dkt. #24-10 at 31–32, ¶¶ 3, 4). Moreover, Petitioner has not demonstrated that there is a reasonable probability that, but for trial counsel's unprofessional errors during his cross-examination of M.H., the result of the proceeding would have been different.

Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim.

### g. *Eliciting testimony of an extraneous offense involving M.C.*

Petitioner also contends that trial counsel provided ineffective assistance when he elicited testimony from M.C. that Petitioner sexually abused her at her house. (Dkt. #2 at 7; Dkt. #15 at 69–71).

On trial counsel's cross-examination of M.C., the following exchange occurred:

Q. I think you said in direct you were trying to stop things, right?

A. Yes.

Q. You would agree with me that the easiest way to stop things would be to stop going to his office, right?

A. Yes.

Q. I mean, if you didn't continue to put yourself there personally, he couldn't continue to touch you; wouldn't you agree?

A. Yes.

Q. He wasn't doing it anywhere else except inside his office, according to you, right?

A. At my house.

Q. He did it at your house?

A. Yes.

Q. When was that?

A. My housewarming party.

(Dkt. #26-9 at 71–72). Trial counsel then elicited testimony that M.C. did not mention this incident during her forensic interview or tell Taylor, her dance instructor and Petitioner's girlfriend. (Dkt. #26-9 at 72–73). M.C. testified that she told Detective Davis about the incident but could not recall

when she told her or whether she told her over the phone or in her office. (Dkt. #26-9 at 72–73).

M.C. did not give any details about the alleged abuse.

Petitioner argues that trial counsel rendered ineffective assistance by eliciting testimony from M.C. that Petitioner had sexually abused her at her house when she had not testified about that incident on direct examination. He raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 78–79; Dkt. #24-8 at 17). At the evidentiary hearing, trial counsel testified that he did not recall this line of questioning. (Dkt. #28-8 at 109–11).

The state habeas trial court found that trial counsel was an officer of the court, well known to the court, and credible, and that his testimony was credible. (Dkt. #24-5 at 179, ¶¶ 1–2). After setting forth the *Strickland* standards (Dkt. #24-5 at 179, ¶ 3), the court issued the following findings and conclusions relevant to Petitioner's claim:

> 4. The main defensive theory at trial was that any inappropriate touching was incidental, not intentional. Writ RR 38-39. To implement that theory, counsel's trial strategy was to attack . . . the credibility of the victims. Writ RR 35-38, 76, 147;
>
> . . . .
>
> 78. Applicant argues that trial counsel was ineffective because he elicited testimony from M.C. that she had been sexually abused by Applicant at her home during a party, but M.C. had not testified about that incident on direct. 9 RR 71-72;
>
> 79. Applicant claims that this was prejudicial to him because it added another offense;
>
> 80. Immediately prior to the complained-of exchange, trial counsel asked M.C. if she would agree "that the easiest way to stop things would be to stop going to his office, right?" 9 RR 71. After she responded in the affirmative, counsel continued, "I mean, if you didn't continue to put yourself there personally, he couldn't continue to touch you; wouldn't you agree?" 9 RR 71. Again she agreed, and counsel followed up, "He wasn't doing it anywhere else except inside his office, according to you, right?" 9 RR

81. After M.C. explained that he had abused her (without giving any details about what the abuse was) during a housewarming party at her house, counsel asked her if she told anyone about it previously; she said that she had told the detective but did not know if it was on the phone or when it was she told her, and she admitted that she did not mention the housewarming party in her forensic interview. 9 RR 72-73;

82. Counsel asked the initial question in furtherance of his defensive theory that the victims kept going back to Applicant even after being abused, and when he received an answer that he did not expect, he immediately attempted to impeach her, which was another defensive strategy;

83. Applicant has failed to prove by a preponderance of the evidence that counsel's strategy was deficient and th[at] he was prejudiced by the alleged deficiency[.]

(Dkt. #24-5 at 179–80, 194–95). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. The state court thoroughly reviewed the record, and applying the *Strickland* standard, concluded that trial counsel did not render ineffective assistance by eliciting M.C.'s unexpected testimony that Petitioner had abused her at her home during a party. Petitioner has failed to show that the state court's application of the *Strickland* standard was unreasonable. Before M.C.'s complained-of-testimony, trial counsel was able to stress that, despite alleged abuse, M.C. continued to return to Petitioner for treatment at his office. This was a significant part of the defense theory. In furthering this theory, trial counsel attempted to emphasize that Petitioner allegedly abused M.C. only at his office. It is not the province of the courts to second guess counsel's cross-examination strategy. *Ford*, 315 F. Supp. 2d at 859. Petitioner has not overcome the presumption that trial counsel's strategy of attacking M.C.'s credibility on cross-examination was reasonable. That trial counsel

54

could not recall at the evidentiary hearing his strategy for eliciting the complained-of testimony does not change the calculus. The state court found trial counsel's testimony that he could not recall his specific decision-making in this case to be credible, noting that the evidentiary hearing occurred nearly nine years after Petitioner's trial. (Dkt. #24-10 at 31–32, ¶¶ 3, 4). It is evident from the state court record that trial counsel was attempting to impeach M.C.'s credibility.

Moreover, when M.C. unexpectedly responded that Petitioner had abused her at her home, trial counsel immediately attempted to impeach her testimony by emphasizing that M.C. never mentioned the alleged incident in her forensic interview and by casting doubt about whether she had told Detective Davis about the incident. Importantly, trial counsel did not elicit testimony about any details of the alleged abuse. Although trial counsel's strategy may have failed when an unexpected and potentially damaging answer was given, an unsuccessful strategy does not render trial counsel's assistance constitutionally ineffective. *See Gray v. Lucas*, 677 F.2d 1086, 1094 (5th Cir. 1982) ("[T]he fact that a particular strategy may prove to be unsuccessful does not by itself establish ineffective assistance."). Petitioner has failed to demonstrate that there is a reasonable probability that, but for trial counsel's unprofessional errors in his cross-examination of M.C., the result of the proceeding would have been different.

Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

### h.  Eliciting testimony of extraneous misconduct

Petitioner further asserts that trial counsel provided ineffective assistance when he elicited testimony from H.B.'s mother and E.L. that Petitioner may have tampered with the complainants' medical records. (Dkt. #2 at 7; Dkt. #15 at 71–72).

During cross-examination of H.B.'s mother, J.B., trial counsel asked how many times H.B. returned to see Petitioner after the June 21, 2011, incident of abuse. (Dkt. #26-9 at 233). J.B. stated that H.B. had returned to see Petitioner one time. (Dkt. #26-9 at 233). Trial counsel then confronted J.B. with H.B.'s medical chart, which showed that H.B. had returned to see Petitioner six times after the June incident. (Dkt. #26-9 at 233–35). J.B. agreed that, based on the medical records, H.B. had seen Petitioner six times after the incident. (Dkt. #26-9 at 235). J.B. also testified that H.B. had not seen Petitioner again until four months after the incident, but she acknowledged that H.B.'s medical records showed a contrary and shorter timeline. (Dkt. #26-9 at 233–34). When trial counsel asked whether she had any reason to believe that the medical records were "fabricated," she responded, "I do not recall taking [H.B.] at all until we went back in late -- what I recall was late September, early October." (Dkt. #26-9 at 235). The following exchange then occurred:

Q. Okay. Is it possible someone else brought your daughter to see Dr. Russell without your knowledge?

A. Doubt it.

Q. Okay. So either your memory is not serving you correctly or these records have been fabricated; is that your testimony?

A. Yes, sir.

Q. Do you think it is possible that these records have been fabricated? Do you have any reason to believe that?

A. I have reason to believe because they are handwritten records. I mean, anybody can get a new sheet of paper and write something new.

Q. So your testimony, if I understand, is from your recollection, it was four months until [H.B.] went back to Dr. Russell with you?

A. That is my memory, and I am the one who would make the appointments. So even if my mom took her or even if my husband would take her, I am the one that would make the appointments. Nobody else made appointments for her.

Q. Okay. And so by your testimony, you didn't go back until October, but that's certainly -- October was after the date of the incident, the date of the discomfort on June 21st, correct?

A. Correct.

. . . .

Q. Is it possible, maybe, you mixed up [your other daughter's] appointments with [H.B.'s] appointments?

A. No.

. . . .

Q. Could you have brought [your other daughter] and [H.B.] to Dr. Russell's office together?

A. In that summer, I don't -- well, that would have been the school year. I don't think so. Mostly, I mean -- I don't recall.

(Dkt. #26-9 at 235-36).

Regarding E.L.'s testimony, the Court notes that Petitioner was charged not only with sexual assault of E.L. when she was an adult but also with indecency with a child when E.L. was younger than seventeen years old. Thus, age was an issue at trial. During cross-examination of E.L., trial counsel sought to show that the offenses did not occur before she was seventeen years old. Specifically, he attempted to impeach E.L.'s credibility regarding the date that she alleged

57

Petitioner had touched her. E.L. testified that she had worked for Petitioner and that the medical records were meticulously kept. (Dkt. #26-10 at 276–77). When E.L. stated that she believed that her chart was inaccurate, trial counsel attempted to impeach her by using her prior testimony that the medical records had been meticulously kept. (Dkt. #26-10 at 277). Trial counsel also explained that Petitioner's office was sealed off before E.L. came forward with her allegations against Petitioner and elicited testimony that E.L. was unaware of this fact. (Dkt. #26-10 at 278-79). This exchange followed:

> Q. So I don't expect that you are insinuating that when David found out you had made these accusations against him he took your file and altered it, correct?
>
> A. No, but that's not to say that he couldn't have altered other -- many charts beforehand.
>
> Q. So it is possible in your mind that he anticipated this day may come, so he decided to take certain dates and delete them from your file?
>
> A. It's possible.
>
> Q. Is that what you are accusing?
>
> A. I am saying that there are services missing from my chart and that it is possible -- I think highly possible that someone tampered with it.

(Dkt. #26-10 at 279). Trial counsel continued to press E.L. on her memory of when the incidents occurred. (Dkt. #26-10 at 279-83).

Petitioner argues that trial counsel rendered ineffective assistance by eliciting testimony that Petitioner may have tampered with the complainants' medical records. He raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 79-80; Dkt. #24-8 at 17; Dkt. #28-5 at 94). At the evidentiary hearing, trial counsel testified that he strategically elicited this testimony because, at the time, he "thought it was best for the case." (Dkt. #28-8 at 114). This exchange ensued:

Q And can you elaborate how it was good for the case to inform the jury that prosecution witnesses had an opinion that he was tampering with evidence?

A Well, for one, on this one, if you continue to scroll down, it looks like I was trying to establish that it is not possible that he could have touched her when she was a minor, which is what you have left off; the last part of the questioning.

Q What does that have to do with whether he may have tampered with records?

A It has everything to do with the charge in which he is standing trial for. He is not charged with tampering records; he is charged with molesting a 16-year-old.

Q Do you think if the jury believed there was a possibility that the defendant was tampering with evidence after the charges had been filed against him that that would help him or hurt him?

A That wasn't possible. He didn't have control of his records at the time.

Q Actually, Judge Roach gave him permission to go back into the office and the inference was that he had done that when he went back into the office?

A It was with supervision, to my recollection. He didn't have access alone to his files after the charges were filed, to my recollection.

Q And do you remember that the office manager for the physician who took over the practice at that location testified that even though he was present when Dr. Russell entered the building that he wasn't watching his every move?

A No, I don't remember that.

Q So you've said that this was strategic. I just need you to articulate how it helped Dr. Russell in your defensive theories for the jury to hear that the complainants and the -- a complainant and the mother of another complainant believed that Dr. Russell may have tampered with evidence?

. . . .

A It was strategic.

Q I know that you are volunteering that everything is strategic, but that's not the end of the inquiry and the courts are going to need to know the strategy. And so I am giving you the opportunity, if you would like, to elaborate on what strategy you thought benefited the defensive theory in the case to suggest to the jury that your client was responsible for tampering with patient records.

59

A I didn't say that he -- I never said that he was responsible for tampering with patient records, number one. That never was my insinuation. I was using the cross examination of these witnesses to impeach their credibility; and specifically, with this individual, that you have got up on the screen in front of me, trying to establish that it wasn't possible he could have touched her on her breast when she was 16-years-old.

So I never insinuated that David tampered with the documents and used this line of questioning to attempt to impeach these complainants that were claiming he had sexually molested them in his office.

Q I want to be clear. I am not suggesting that you personally made the insinuation, but you clearly elicited the speculative opinions of the witnesses that they believed he could have tampered with the evidence, correct?

A And I was using that information to impeach their testimony and those answers to cross examine them on the impossible and ridiculous nature of those accusations.

(Dkt. #28-8 at 114–17).

The state habeas trial court found that trial counsel was an officer of the court, well known to the court, and credible, and that his testimony was credible. (Dkt. #24-5 at 179, ¶¶ 1–2). After setting forth the *Strickland* standards (Dkt. #24-5 at 179, ¶ 3), the court issued the following findings and conclusions relevant to Petitioner's claim:

84. Applicant argues that counsel was ineffective because he elicited testimony from H.B.'s mother and E.L.F.[10] that it was possible that their medical records had been tampered with;

85. During cross-examination of H.B.'s mother, counsel questioned her about how many times H.B. had returned to see Applicant after the date of the incident. 9 RR 233. H.B.'s mother recalled only one, but counsel showed her H.B.'s chart, and asked her about the six times H.B. returned to see Applicant. 9 RR 232-33;

86. This was part of counsel's valid defensive strategy of showing that the victims returned to see Applicant even after they had been sexually abused;

87. During this course of questioning, counsel asked H.B.'s mother, "So either your memory is not serving you correctly or these records have been fabricated; is that

---

[10] The state court referred to E.L. using the initials of her married name, E.L.F.

60

you testimony?" 9 RR 235. H.B.'s mother responded yes, and on follow-up she stated, that she "had reason to believe because they are handwritten records. I mean, anybody can get a new sheet of paper and write something new." 9 RR 235;

88. This testimony was not affirmative evidence that the records had been tampered with;

89. This exchange, taken as a whole, shows that counsel was putting forth his defensive strategy and then when he got an unexpected answer, sought to discredit the witness;

90. Applicant has failed to prove by a preponderance of the evidence that this defensive strategy was deficient and that he was prejudiced by the alleged deficiency;

91. Applicant also argues that counsel was ineffective for eliciting testimony from E.L.F. that the records had been tampered;

92. During cross-examination of E.L.F. trial counsel wanted to establish that the offenses did not occur when she was 16, but when she was 17. Writ RR 99-100;

93. To do this, counsel showed E.L.F. her records from Applicant's office. 10 RR 276-78;

94. When E.L.F. appeared to argue that the records had been tampered with, counsel asked her if she knew that by the time she made allegations against Applicant, the records from Applicant's office had already been seized by police. 10 RR 278. E.L.F. ultimately backed up and stated that the records could have been altered "beforehand." 10 RR 279. Trial counsel concluded the exchange by asking, "So it is possible in your mind that he anticipated that this day may come, so he decided to take certain dates and delete them from his file?" 10 RR 279;

95. This exchange shows that counsel was attempting to prove that the offenses did not occur before she was 17 years' old and when she suggested that the records had been tampered with, confronted her with the impossibility that they had been;

96. Applicant has failed to prove by a preponderance of the evidence that counsel was deficient and that he was prejudiced by the alleged deficiency[.]

(Dkt. #24-5 at 195-97). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

61

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. The state court thoroughly reviewed the record, and applying the *Strickland* standard, concluded that trial counsel did not render ineffective assistance by eliciting the testimony that Petitioner may have tampered with the complainants' medical records. Petitioner has failed to show that the state court's application of the *Strickland* standard was unreasonable. As previously stated, trial counsel's defensive strategy was to attack the complainants' credibility by showing that they returned to Petitioner for treatment even after they had been sexually assaulted. Petitioner has not overcome the presumption that trial counsel's strategy was reasonable. During cross-examination of H.B.'s mother, J.B., trial counsel asked questions that aligned with this defensive strategy. When J.B. unexpectedly testified that H.B.'s medical records may have been fabricated, trial counsel immediately attempted to attack J.B.'s credibility. Trial counsel attempted to attack E.L.'s credibility by focusing on discrediting her allegation that Petitioner had touched her when she was younger than seventeen years old. As with J.B., when E.L. unexpectedly suggested that Petitioner may have tampered with her medical records, trial counsel immediately sought to discredit her testimony. Elicitation of an unexpected answer during a line of questioning that furthered the defensive strategy does not render trial counsel's assistance constitutionally ineffective. *See Gray*, 677 F.2d at 1094. Furthermore, Petitioner has failed to demonstrate that there is a reasonable probability that, but for trial counsel's unprofessional errors, the result of the proceeding would have been different.

Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an

62

unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

### i.    *Failure to object to improper character evidence*

Petitioner asserts that trial counsel provided ineffective assistance when he failed to object to inadmissible testimony about a complainant's good character. (Dkt. #2 at 7; Dkt. #15 at 73–74).

H.B.'s mother, J.B., testified on direct examination that H.B. was "a very generous girl, very good to her friends, caring, smart." (Dkt. #26-9 at 203). Petitioner argues that trial counsel was ineffective for failing to object to this testimony. He raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 80–81; Dkt. #24-8 at 17; Dkt. #28-5 at 94). At the evidentiary hearing, trial counsel testified that J.B.'s testimony was objectionable, but he decided not to object for strategic reasons. (Dkt. #28-8 at 118). He explained that he "didn't find it to be strategically advantageous to object to a mother calling her daughter caring, smart, and good to her friends while her daughter was a complaining witness in a sexual assault case that had been all over the news for the last year." (Dkt. #28-8 at 119). Trial counsel's explanation echoed his earlier sentiments about when to object at trial:

> Because there was a certain point during the trial, as a defense lawyer, that I was concerned about, as I am in every trial, connecting with the jury and, in essence, having the jury connect with my client. And there are moments to object strategically and there are moments to sit down and keep your mouth shut and fight bigger fights at a later time. But when you have got a case of this nature, these kinds of allegations, these are not robots sitting in the jury box; and I have to make decisions on the fly, at times, based on feel, experience, and expertise in this field as to when to object and when not to from a much bigger picture standpoint.

(Dkt. #28-8 at 75–76). Trial counsel declined to speculate whether the trial court would have sustained an objection to J.B.'s testimony under Texas Rules of Evidence 404(a). (Dkt. #28-8 at 120).

The state habeas trial court found that trial counsel was an officer of the court, well known to the court, and credible, and that his testimony was credible. (Dkt. #24-5 at 179, ¶¶ 1–2). After setting forth the *Strickland* standards (Dkt. #24-5 at 179, ¶ 3), the court issued the following findings and conclusions relevant to Petitioner's claim:

> 97. Applicant argues that trial counsel was ineffective because he failed to object to H.B.'s mother's testimony that H.B. was "a very generous girl, very caring, very good to her friends, smart." 9 RR 203;
>
> 98. Counsel did not want to object to a mother of a child sexual assault victim complimenting her daughter. Writ RR 104;
>
> 99. Counsel expressed during the hearing that he tries to keep on the good side of the jury and makes his objections accordingly. Writ RR 32, 60-61;
>
> 100. Counsel's strategy in choosing not to object was valid;
>
> 101. Applicant has failed to prove by a preponderance of the evidence that counsel was deficient[.]

(Dkt. #24-5 at 197-98). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. The state court thoroughly reviewed the record, and applying the *Strickland* standard, concluded that trial counsel did not render ineffective assistance by failing to object to J.B.'s complained-of-testimony. Petitioner has failed to show that the state court's application of the *Strickland* standard was

unreasonable. Specifically, Petitioner has failed to overcome the presumption that trial counsel's decision not to object might be considered sound trial strategy. Indeed, a reasonable attorney could have decided that challenging a mother's testimony about the good character of her child, who was a sexual assault complainant, risked alienating or antagonizing the jury. Upon review of the record, the Court agrees with the state court that Petitioner has failed to establish that trial counsel performed in a constitutionally deficient manner for failing to object to J.B.'s testimony regarding H.B.'s good character.

Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

### j. *Failure to object to, and elicitation of, testimony about Petitioner's sexually offensive comments*

Petitioner further argues that trial counsel provided ineffective assistance when he failed to object to and elicited irrelevant, highly prejudicial testimony about Petitioner's sexually offensive comments made to adults. (Dkt. #2 at 7; Dkt. #15 at 74–78).

<u>Failure to Object</u>

Petitioner asserts that trial counsel should have objected to the following testimony:

- Mullendore testified that Petitioner made an "inappropriate and awkward" comment about "what [her] panties said" during one of her treatments. (Dkt. #26-8 at 198).

- M.H. testified that Petitioner made "unusual comments" to her during treatment, such as telling her they would be married in several countries based on his treatment of her,

65

that he could "sell [her] for a canoe," and that he had a "fetish for white skin." (Dkt. #26-9 at 328-29, 330-31).

- Valerie Anderson, one of Petitioner's employees, testified that Petitioner discussed sexual topics in the clinic, including bra size, breasts, and his preference for white skin (Dkt. #26-11 at 148-50, 152); and that four female employees or patients had complained of inappropriate words or conduct by Petitioner during the eleven years that she worked for him (Dkt. #26-11 at 153-59, 175).

- Taylor, Petitioner's girlfriend, testified that she disliked it when he "talk[ed] about the size of women's breasts"; that Petitioner wanted her to get breast implants; that Petitioner once ranked the female employees at her dance studio by attractiveness; and that he discussed sex, sexual positions, and his preference for white skin. (Dkt. #26-12 at 50, 52).

- Samantha Camarillo, a former dance student and instructor at the Taylor Dance Center, testified that Petitioner treated her in 1999 or 2000 and made comments about "women's chests" and comments "of a sexual nature." (Dkt. #26-12 at 105–06).

Petitioner argues that trial counsel performed deficiently for not objecting to this testimony under Texas Rules of Evidence 402, 403, and 404(b)(2) and article 38.37 of the Texas Code of Criminal Procedure. (Dkt. #15 at 77). Petitioner raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 81–83; Dkt. #24-8 at 17). At the evidentiary hearing, trial counsel testified that, "at the time," he believed that testimony about Petitioner's "habit of discussing sexual topics with adult women was admissible" and that an objection would have been meritless. (Dkt. #28-8 at 126–27).

66

The state habeas trial court found that trial counsel was an officer of the court, well known to the court, and credible, and that his testimony was credible. (Dkt. #24-5 at 179, ¶¶ 1–2). After setting forth the *Strickland* standards (Dkt. #24-5 at 179, ¶ 3), the court issued the following findings and conclusions relevant to Petitioner's claim:

102. Applicant argues that counsel was ineffective because he did not object to multiple instances of adults' testimony regarding Applicant's inappropriate sexual comments to them. Applicant complains about the following:

- During an examination, Applicant commented to Mullendore about "what [her] panties said, which was kind of inappropriate and awkward." 9 RR 198;

- During her examinations, Applicant would tell M.H. how pretty she was, "how [they] were married in several countries and he could sell [her] for a canoe," that he had a fetish for white skin and had dated a girl with milky white skin." 9 RR 328-31;

- One of Applicant's employees testified that Applicant discussed sexual topics at the clinic, including bra size, breast size, his preference for white skin, and how touching a patient would require marriage in certain countries. 11 RR 149-50;

- Applicant's girlfriend testified that she disliked it when Applicant talked about other women's breasts, that he wanted her to obtain breast implants, that he ranked female employees at her dance studio by appearance, and Applicant openly talked about sex, sexual positions, and his preference for white skin. 12 RR 52;

- A former patient testified that during her exams, Applicant "made a lot of comments that were sexual in nature." 12 RR 106;

103. Applicant was charged with multiple sexual offenses that included "intent to arouse or gratify sexual desire" as an element of the offense;

104. Evidence that Applicant freely and openly discussed sexual matters, that he discussed them in the office and during examinations, tended to show Applicant's intent or motive to arouse or gratify his sexual desire during the examinations;

105. The evidence was admissible under the Texas Rules of Evidence and the trial court would not have erred in overruling any objection to this testimony had it been made;

106. Applicant has failed to meet his burden of proof by a preponderance of the evidence that counsel was deficient and that he was prejudiced by the alleged deficiency[.]

(Dkt. #24-5 at 198-99). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. Under Texas law, relevant evidence is admissible unless otherwise provided by the United States or Texas Constitution, a statute, the Texas Rules of Evidence, or other rules prescribed under statutory authority. Tex. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence more or less probable than it would be without the evidence." Tex. R. Evid. 401. Texas law provides that evidence of other crimes, wrongs, or other acts may be admissible to prove a defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Tex. R. Evid. 404(b)(2). However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Tex. R. Evid. 403.

Petitioner was charged with multiple counts of indecency with a child, which required the State to prove that Petitioner acted "with intent to arouse or gratify the sexual desire of any person." Tex. Penal Code Ann. § 21.11(a)(1); *see also* Tex. Penal Code Ann. § 21.11(c) ("In this section, 'sexual contact' means the following acts, if committed with the intent to arouse or gratify

68

the sexual desire of any person . . . .”). His defensive theory was that any touching of the complainants was accidental and not done with the requisite sexual intent. Deferring to the state court's implied finding that the evidence was relevant, apart from its character-conformity value, and admissible under the Texas Rules of Evidence to show Petitioner's intent to arouse or gratify his own sexual desire during chiropractic examinations and not unduly prejudicial,[11] the state court's rejection of the claim is not objectively unreasonable.

Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

<u>Elicitation of Testimony</u>

Petitioner also argues that trial counsel provided ineffective assistance because he elicited testimony that Petitioner made sexually offensive comments to adults. Specifically, Petitioner takes issue with the following testimony:

- Anderson, one of Petitioner's employees, testified that two employees complained that Petitioner made statements that made them feel uncomfortable, such as discussing women's breast sizes, but that neither employee left her job at the clinic "because of the

---

[11] The state habeas court also implicitly rejected Petitioner's argument that trial counsel's failure to object to the complained-of-testimony under Texas Code of Criminal Procedure article 38.37 constituted ineffective assistance. Article 38.37 relates to the admissibility of evidence of extraneous sexual offenses against children; it is wholly inapplicable to the above testimony, which concerned inappropriate and offensive sexual comments made by Petitioner to adults, not sexual offenses against a child. Petitioner has failed to make any cogent argument regarding the applicability of article 38.37 to this testimony or how an objection based on article 38.37 would have been successful in having the testimony excluded. Petitioner has failed to show that the state court's implicit rejection of this argument was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

complaints they made to [Anderson]"; that Petitioner discussed sexual topics openly in the office; and that an unnamed patient once reported Petitioner to the police, claiming that she was uncomfortable at the clinic, and that the police told them to remove the patient from the mailing list, which they "promptly did." (Dkt. #26-11 at 91– 93).

- Charlotte Robinson, one of Petitioner's employees, testified that Petitioner occasionally would make a comment to a patient that made the patient uncomfortable, such as about breast size. (Dkt. #26-11 at 270). She testified that two patients had requested to change doctors because Petitioner was "a flirt." (Dkt. #26-11 at 278).

Petitioner argues that trial counsel performed deficiently for eliciting testimony that Petitioner made sexually offensive comments. Petitioner raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 81-83; Dkt. #24-8 at 17). At the evidentiary hearing, trial counsel testified that, nine years after the trial, he could not recall why he elicited the same line of testimony from various witnesses but assumed it "must have been strategic." (Dkt. #28-8 at 127–28).

The state habeas trial court found that trial counsel was an officer of the court, well known to the court, and credible, and that his testimony was credible. (Dkt. #24-5 at 179, ¶¶ 1–2). After setting forth the *Strickland* standards (Dkt. #24-5 at 179, ¶ 3), the court issued the following findings and conclusions relevant to Petitioner's claim:

107. Applicant claims that counsel was ineffective for eliciting testimony about Applicant's inappropriate sexual comments;

108. First, Applicant complains about a former employees' testimony that other employees were uncomfortable and that she heard him talk about sex. 11 RR 91-93;

109. Counsel used these questions to show that even though Applicant had made comments, neither of the two employees that complained left the office, and only one patient complained that Applicant talked about sex. 11 RR 91-93;

70

110. This testimony was beneficial, not harmful, to Applicant;

111. Applicant has failed to prove by a preponderance of the evidence that counsel's strategy in asking about the comments was deficient and that he was prejudiced by the alleged deficiency;

112. Applicant complains that counsel elicited testimony from another employee that Applicant occasionally made comments to patients that made them uncomfortable and the patients would ask to see the other chiropractor. 11 RR 270-71;

113. This exchange showed that other patients that Applicant had only made comments to had stopped seeing him and asked to be treated by the other chiropractor;

114. This supported the defensive strategy of challenging the victims' credibilities by showing that they returned to Applicant for treatment;

115. Applicant has not shown by a preponderance of the evidence that trial counsel's defensive strategy was deficient and that he was prejudiced by the alleged deficiency[.]

(Dkt. #24-5 at 199-201). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. The state court thoroughly reviewed the record, and applying the *Strickland* standard, concluded that trial counsel did not render ineffective assistance by eliciting the complained-of-testimony. Petitioner has failed to show that the state court's application of the *Strickland* standard was unreasonable. The state court record confirms that trial counsel elicited testimony that, although Petitioner made sexual comments at the clinic that made two employees feel uncomfortable, the employees did not leave their employment at the clinic. The state court found that this testimony was beneficial to

71

Petitioner. Petitioner's comments, although inappropriate, were not criminal and did not result in either employee leaving her job at the clinic. Furthermore, trial counsel elicited testimony that patients who felt uncomfortable around Petitioner simply stopped seeing him and switched to a different chiropractor. This contrasted with the complainants, who continued to see Petitioner for treatment even after the abuse. Petitioner has not overcome the presumption that trial counsel's trial strategy was reasonable. That trial counsel could not recall at the evidentiary hearing his strategy for eliciting the complained-of testimony does not change the calculus. The state court found trial counsel's testimony that he could not recall his specific decision-making in this case to be credible, noting that the evidentiary hearing occurred nearly nine years after Petitioner's trial. (Dkt. #24-10 at 31–32, ¶¶ 3, 4). It is evident from the state court record that trial counsel elicited this testimony to support the defensive strategy of attacking the complainants' credibility. Moreover, Petitioner has failed to demonstrate that there is a reasonable probability that, but for trial counsel's unprofessional errors, the result of the proceeding would have been different.

Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

### k. *Failure to object to, and elicitation of, testimony regarding complaints to the Texas Board of Chiropractor Examiners and suspension of Petitioner's chiropractic license*

Petitioner contends that trial counsel provided ineffective assistance when he failed to object to, and then emphasized, testimony about complaints to the Texas Board of Chiropractor Examiners that resulted in the suspension of Petitioner's license. (Dkt. #2 at 7; Dkt. #15 at 78–80).

72

He asserts that "[t]he testimony informed jurors that a government agency already had concluded that petitioner committed the charged offenses, although the agency did not apply the same standard of proof that the jury had to apply." (Dkt. #15 at 79).

Scott Parker, the Director of Enforcement for the Texas Board of Chiropractic Examiners ("the Board"), testified that he investigated three complaints made against Petitioner in November 2011. (Dkt. #26-9 at 126). According to Parker, Petitioner violated the Board rules governing chiropractors located in the Texas Administrative Code—specifically, the rule against unprofessional conduct, which includes "engaging in sexual misconduct with a patient within the chiropractic/patient relationship." (Dkt. #26-9 at 132). When the State asked Parker to define sexual misconduct, trial counsel objected based on Rule 403 and relevance, but the trial court overruled the objection. (Dkt. #26-9 at 132–33). Parker then read the relevant statutory definition of sexual misconduct. (Dkt. #26-9 at 134). He testified that the Board suspended Petitioner's chiropractic license on November 17, 2011. (Dkt. #26-9 at 136).

On cross-examination, trial counsel elicited testimony that one other complaint alleging "sexual misconduct" against Petitioner was filed in 2011 by someone who was not "an actual victim or actual patient." (Dkt. #26-9 at 137). Parker also testified that no complaints of sexual misconduct had been filed against Petitioner before 2011, and that for sixteen years—between the time he became a licensed chiropractor in 1995 until 2011—there were no complaints against Petitioner concerning sexual misconduct or inappropriate comments. (Dkt. #26-9 at 137–38). Trial counsel elicited testimony that Parker did not talk to any of the named witnesses in Petitioner's criminal case, did not review any of the interviews or statements made by the complainants, and obtained most, if not all, of the information in Petitioner's case from the offense reports generated

73

by Detective Davis. (Dkt. #26-9 at 139–40). Trial counsel also elicited testimony that Petitioner's license was suspended "because of the allegations in this case," which were "pretty well publicized by the news media." (Dkt. #26-9 at 141). Parker agreed that, outside of what Detective Davis told him, he did not "do much work on the case" himself. (Dkt. #26-9 at 141). Trial counsel then clarified that, at the time of trial, Petitioner's license was suspended, not revoked, which was an option available to the Board. (Dkt. #26-9 at 141–42).

On redirect, Parker explained that Petitioner's license was suspended pending the outcome of the criminal case. (Dkt. #26-9 at 144). The State asked Parker under what circumstances an "immediate emergency temporary suspension" is used, and trial counsel objected on the basis that Parker lacked the expertise to answer the question because he was not on the Board. (Dkt. #26-9 at 144). The trial court instructed the State to lay a foundation, and upon doing so, Parker testified that, under the "Texas Occupations Code, Chiropractic Act 21.507, the Texas Administrative Code, Chapter 75.9, if the [B]oard deems there is an imminent threat to the public, they have the right to do an emergency suspension of the person's license." (Dkt. #26-9 at 145).

Petitioner argues that trial counsel provided ineffective assistance when he failed to object to and elicited testimony that Parker had investigated complaints against Petitioner and that the Board had suspended his license based on the criminal allegations in his state court cases. Petitioner raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 84-85; Dkt. #24-8 at 18). At the evidentiary hearing, trial counsel testified that he did not believe that Parker's testimony regarding the suspension of Petitioner's chiropractic license was an improper opinion that Petitioner "had engaged in the alleged conduct." (Dkt. #28-8 at 133). Trial counsel testified that

74

he could not recollect the strategy behind eliciting Parker's complained-of-testimony. (Dkt. #28-8 at 133–35).

The state habeas trial court found that trial counsel was an officer of the court, well known to the court, and credible, and that his testimony was credible. (Dkt. #24-5 at 179, ¶¶ 1–2). After setting forth the *Strickland* standards (Dkt. #24-5 at 179, ¶ 3), the court issued the following findings and conclusions relevant to Petitioner's claim:

> 116. Applicant also argues that counsel was ineffective because he did not object to Scott Parker's (the Director of the Texas Board of Chiropractor Examiners) testimony that he had investigated four complaints against Applicant in 2011, that Applicant's license was suspended after his investigation, and that there was a finding that Applicant was a threat to the public. 9 RR 126, 136, 145. Applicant further claims that counsel was ineffective because he elicited testimony that another complaint was filed in 2011. 9 RR 137-38;
>
> 117. Applicant has failed to show that he was prejudiced by the lack of objection and trial counsel's decision to question him about the complaints;
>
> 118. Parker's testimony only included that he was an investigator, that it was determined that Applicant broke the administrative rule against sexual impropriety, what that rule prohibited, and that Applicant's license was suspended. 9 RR 134-36;
>
> 119. During cross-examination, counsel elicited testimony that Parker did not conduct an independent investigation, he did not look at any evidence other than the offense reports, that the only other complaint against Applicant was in 2011 and that did not include any actual patient, and that the Board could have revoked Applicant's license, but instead only suspended it. 9 RR 136-43;
>
> 120. Counsel was able to use the testimony that he elicited from Parker to show that the Board only based its decision on the offense reports and did not actually revoke his license[.]

(Dkt. #24-5 at 201–02). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

75

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. The state court thoroughly reviewed the record, and applying the *Strickland* standard, concluded that trial counsel did not render ineffective assistance by failing to object to and eliciting the complained-of-testimony. Petitioner has failed to show that the state court's application of the *Strickland* standard was unreasonable. The state record confirms that Parker's testimony included only that he was an investigator, that he did not conduct an independent investigation, that he did not review any evidence in Petitioner's criminal case other than the offense reports, that it was determined that Petitioner violated the administrative rule against sexual impropriety, what that rule prohibited, that the only other complaint against Petitioner was in 2011 and did not involve a patient, and that the Board could have revoked Petitioner's license but decided only to suspend it. This testimony tended to undermine the significance of the Board's actions in that the Board based its decision only on the criminal allegations in the offense reports, which were "pretty well publicized by the news media," and did not actually revoke Petitioner's license. Furthermore, Petitioner has failed to establish that Parker's testimony was unduly prejudicial. The state court record confirms that Parker did not express his opinion as to whether Petitioner was guilty of the criminal charges. Nor did Parker's testimony "inform[] jurors that a government agency already had concluded that petitioner committed the charged offenses, although the agency did not apply the same standard of proof that the jury had to apply." (Dkt. #15 at 79). Petitioner has failed to demonstrate that there is a reasonable probability that, but for trial counsel's unprofessional errors related to Parker's testimony, the result of the proceeding would have been different.

Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

### 2. Failure to Request Jury Instructions

Next, Petitioner asserts that he received ineffective assistance of counsel when trial counsel failed to request defensive jury instructions. (Dkt. #2 at 7; Dkt. #15 at 80–87).

#### a. *Instruction regarding lesser-included offense*

Petitioner contends that trial counsel provided ineffective assistance when he failed to request a jury instruction on the lesser-included offense of misdemeanor assault under Texas Penal Code § 22.01 in M.H.'s case. (Dkt. #2 at 7; Dkt. #15 at 80–84).

To establish that counsel's performance was deficient for failing to request an instruction on a lesser-included offense or object to the omission of such instruction, a petitioner must first show that he was entitled to such instruction. *Pin v. Dretke*, No. 3:03-CV-2282-M, 2005 WL 2453034, at *9 (N.D. Tex. Oct. 4, 2005). Under Texas law, a defendant is entitled to a lesser-included offense instruction when (1) the lesser-included offense is included within the proof necessary to establish the offense changed and (2) there is some evidence showing that if the defendant is guilty, he is guilty only of the lesser offense. *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App. 1993); Tex. Code Crim. Proc. Ann. art. 37.09 (defining lesser included defense).

77

To determine satisfaction of the first part of the *Rousseau* test, Texas state courts look to the offense actually charged in the indictment and the statutory elements of the charged offense and the alleged lesser-included offense. *See Jacob v. State*, 892 S.W.2d 905, 907–08 (Tex. Crim. App. 1995) (en banc). Here, Petitioner was charged with sexual assault of M.H. pursuant to Texas Penal Code § 22.011(a)(1) based on intentionally and knowingly causing the penetration of M.H.'s sexual organ by his finger without M.H.'s consent. (Dkt. #28-2 at 11). Texas Penal Code § 22.011(a)(1)(A) provides that a person commits sexual assault if he intentionally or knowingly "causes the penetration of the anus or sexual organ of another person by any means, without that person's consent." Tex. Penal Code § 22.011(a)(1)(A). A person commits offensive-contact Class C Misdemeanor Assault if the person intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative. Tex. Penal Code § 22.01(a)(3).

In *Chabrier v. State*, 592 S.W.3d 188 (Tex. App.—Austin 2019, no pet.), the TCCA held that offensive-contact assault is not a lesser-included offense of sexual assault. The court reasoned:

> To prove that [the defendant] committed sexual assault, the State was required to prove that he penetrated [the complainant's] sexual organ without her consent; the State was not required to prove that [the defendant] knew or should have reasonably believed that [the complainant] would regard the contact as offensive or provocative. In other words, [the defendant] could be guilty of penetrating [the complainant's] sexual organ without her consent even if there was no evidence presented as to his knowledge or belief that [the complainant] would regard the contact as offensive or provocative.

> Following the analysis in *McKithan*, *Mathis*, and the other cases cited above, we conclude that the elements of offensive-contact assault are not "functionally the same or less than those required to prove" the charged offense of sexual assault. *See McKithan*, 324 S.W.3d at 590–91, 593–94; *Mathis*, 443 S.W.3d at 398; *Scott*, 202 S.W.3d at 412; *Ramos*, 981 S.W.2d at 701. Accordingly, the district court did not err in refusing [the defendant's] request for an instruction on offensive-contact assault.

*Id.* at 195.

The state habeas trial court rejected Petitioner's claim (Dkt. #24-5 at 85-87; Dkt. #24-8 at 18) that trial counsel was ineffective for failing to request a lesser-included offense instruction:

> 122. Offensive-contact assault is not a lesser-included offense of sexual assault. *See Chabrier v. State*, 592 S.W.3d 188, 195 (Tex. App.-Austin 2019, no pet.);

> 123. Applicant has not shown by a preponderance of the evidence that trial counsel was deficient for not requesting an instruction he was not entitled to and that he was prejudiced by the alleged deficiency[.]

(Dkt. #24-5 at 202). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

This Court cannot review the state court's determination that offensive-contact assault is not a lesser-included offense of sexual assault under Texas law. *See Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 67–68); *Charles*, 629 F.3d at 500-501; *Young*, 356 F.3d at 628; *Little*, 162 F.3d at 862; *Gibbs*, 154 F.3d at 259. Because the state court found that a jury instruction for the lesser-included offense of misdemeanor offensive-contact assault was not warranted under Texas law, *see Chabrier*, 592 S.W.3d at 195, it concluded that trial counsel had no basis to request such instruction or to object to its absence from the jury charge. The state court's application of *Strickland* was reasonable. The failure to request a lesser-included offense instruction to which Petitioner was not entitled, or object to its absence, does not constitute deficient representation. Furthermore, Petitioner has shown no prejudice from the failure of trial counsel related to the omitted lesser-included-offense instruction. He has not shown a reasonable probability that the outcome of his trial would have differed had trial counsel requested the instruction or lodged an objection to the

jury charge. Specifically, he has shown no reasonable probability that the trial court would have included any instruction on the alleged lesser-included offense.

Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

### b.  Statutory defense jury instruction

Petitioner also argues that trial counsel provided ineffective assistance when he failed to request a jury instruction on the statutory defense of medical care for a child pursuant to Texas Penal Code §§ 22.011(d) and 22.021(d). (Dkt. #2 at 7; Dkt. #15 at 84–87).

Under Texas law, it is a defense to prosecution for sexual assault of a child "that the conduct consisted of medical care for the child and did not include any contact between the anus or sexual organ of the child and the mouth, anus, or sexual organ of the actor or a third party." Tex. Pen. Code § 22.011(d). This defense also applies to prosecution for aggravated sexual assault. Tex. Pen. Code § 22.021(d). Petitioner contends that trial counsel should have raised this medical care defense to the charged offenses involving E.L., M.C., and H.B.

Petitioner raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 87–89; Dkt. #24-8 at 18; Dkt. #28-5 at 93). At the evidentiary hearing, trial counsel testified that he did not believe the evidence raised a statutory defense of medical care to a child or that he should have requested that instruction. (Dkt. #28-8 at 147–49). He also testified that it was never his strategy to show that Petitioner intentionally inserted his finger into the complainants' vaginas for medical

80

purposes. (Dkt. #28-8 at 158–59). When asked whether he "ever consider[ed] doing two different defenses; that it was incidental, and if it wasn't incidental, then it was intentional for medical purposes," he responded:

> No, from a strategic standpoint, that didn't seem to make any sense at all. It would be difficult to play both sides of that coin and remain credible with the jury and have them believe that you are putting forward a credible defense. To be able to at one point say he didn't do it, meaning he didn't ever insert his finger into a vagina, but then on the other hand say but if he did, here's the reason why and why it is accepted just was not a viable defense.

(Dkt. #28-8 at 159). Trial counsel also confirmed that his "strategy throughout was just that it was incidental touching" and that he "wanted to make the jury understand" that he was "not saying" that Petitioner "inserted his finger in anybody's vagina." (Dkt. #28-8 at 160). He explained:

> Our strategy throughout, with cooperation from my client and his whole understanding of everything that was going on, as well as the other lawyers involved and the other trial team members, was that this was a very busy practice with open areas, open doors, many people; and that David moved from patient to parent in a very quick manner.
>
> And a lot of his patients were smaller in nature, and so for him to put his hands in certain positions to make them feel better from a chiropractic standpoint, it was entirely possible that his hands inadvertently would brush against the private areas of females. And that none of it was ever done for a sexual purpose, so there was no sexual intent to arouse or gratify himself or the patient or anybody else, and he certainly never inserted his finger into anyone's vagina, whether it is a child or an adult. And that was our defense from day one.

(Dkt. #28-8 at 160–61).

The state habeas trial court found that trial counsel was an officer of the court, well known to the court, and credible, and that his testimony was credible. (Dkt. #24-5 at 179, ¶¶ 1–2). After setting forth the *Strickland* standards (Dkt. #24-5 at 179, ¶ 3), the court issued the following findings and conclusions relevant to Petitioner's claim:

81

4. The main defensive theory at trial was that any inappropriate touching was incidental, not intentional. Writ RR 38-39. To implement that theory, counsel's trial strategy was to attack the investigation, the lack of physical evidence, the lack of eyewitnesses despite the crowded office space, and the credibility of the victims. Writ RR 35-38, 76, 147;

. . . .

124. Applicant argues that trial counsel was ineffective because he failed to request an instruction on the medical care of a child defense under sections 22.011 and 22.021 of the Texas Penal Code;

125. Counsel's theory always was that there was only incidental contact, not that any contact was medically required. Writ RR 143-44;

126. Counsel did not want to present dual theories: that the touching was incidental and it was not incidental it was intentional for medical purposes. Writ RR 144;

127. From a strategic standpoint, "it would be difficult to play both sides of the coin and remain credible with the jury and have them believe that you are putting on a credible defense." Writ RR 144;

128. Counsel's decision to promote one, solid, coherent defensive theory was valid strategy;

129. Applicant has not shown by a preponderance of the evidence that counsel's strategy was deficient and that he was prejudiced by the alleged deficiency[.]

(Dkt. #24-5 at 179–80, 202–03). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. The state court thoroughly reviewed the record, and applying the *Strickland* standard, concluded that trial counsel did not render ineffective assistance by not requesting an instruction on the medical care

82

of a child defense. Petitioner has failed to show that the state court's application of the *Strickland* standard was unreasonable. At the outset, the statutory defense would only have been applicable to the charges of sexual assault of a child related to M.C. and aggravated sexual assault of a child related to H.B. It would not have applied to any charges related to E.L. because Petitioner was not charged with sexual assault of a child or aggravated sexual assault related to E.L. Furthermore, because Petitioner was acquitted of aggravated sexual assault of H.B., Petitioner has failed to demonstrate that any error in failing to request a medical care defense instruction prejudiced his defense related to that specific charge. Regardless, Petitioner has failed to overcome the presumption that trial counsel's decision not to request a medical care defense instruction was based on sound trial strategy to present one, cohesive defense theory. As the state court found, trial counsel made a reasonable strategic decision not to present dueling theories that the touching was incidental and that it was intentional for medical purposes. A medical care defense instruction would have conflicted with the defensive strategy that no penetration occurred. Petitioner has failed to establish that trial counsel performed in a constitutionally deficient manner in not requesting an instruction on the medical care of a child defense or that Petitioner was prejudiced thereby under the *Strickland* test.

Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

## B.  <u>Constructive Denial of Counsel (Ground 2)</u>

In his second ground for relief, Petitioner contends that he was constructively denied the right to assistance of counsel at the hearing on the first jury note because trial counsel participated by phone. (Dkt. #2 at 6; Dkt. #15 at 94–101). He argues that this constructive denial of counsel constitutes structural error under *United States v. Cronic*, 466 U.S. 648 (1984).

The existence of certain structural defects in a trial, such as the deprivation of the right to counsel, requires automatic reversal of the conviction because it infects the entire trial process. *Brecht*, 507 U.S. at 629–30. In *Cronic*, the Supreme Court recognized that a defendant might be denied counsel even though an attorney had been appointed to represent him if, *inter alia*, the defendant was denied counsel at a "critical stage" of his criminal proceedings. 466 U.S. at 658–62. "*Cronic* instructed that a presumption of prejudice would be in order in 'circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'" *Florida v. Nixon*, 543 U.S. 175, 190 (2004) (internal citation omitted). Thus, *Cronic* "recognized a narrow exception to *Strickland*'s holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense." *Id.* Stated differently, *Cronic* clearly established that the complete denial of counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice. 466 U.S. at 659.

Before jury deliberations began, a brief hearing was held outside the presence of the jury. Trial counsel and the prosecutor were present; Petitioner was not present. (Dkt. #26-13 at 4). The trial court stated that trial counsel had requested that if there were any jury notes that he be allowed

to appear by phone and Petitioner not "appear at all." (Dkt. #26-13 at 4). The prosecutor agreed to these requests. (Dkt. #26-13 at 4).

Later that day, during jury deliberations, the jury sent a note with two requests. First, the jury requested "the transcript of [H.B.] pertaining to her testimony of her description of the defendant placing his hand inside her underwear on her female sexual organ." (Dkt. #26-13 at 7). Second, the jury requested the "[l]egal description of penetration." (Dkt. #26-13 at 7). The prosecutor was present in the courtroom and trial counsel participated by phone when the trial court read the note. (Dkt. #26-13 at 7). Petitioner was not present. (Dkt. #26-13 at 7). Initially, the trial court proposed responding to the first request as follows: "[Y]ou [the jury] have received all the law and evidence that you are going to receive in this case. Please continue your deliberations." (Dkt. #26-13 at 8). Trial counsel asked about an instruction explaining to the jury that they could not get a transcript read-back unless they were in conflict about the testimony. (Dkt. #26-13 at 8–10). The trial court then agreed to instruct the jury as follows: "You are not entitled to a general read-back of testimony. Please refer to the Charge regarding a request for a transcript of testimony." (Dkt. #26-13 at 10–11). As to the second request, the trial court proposed responding, "You have received all of the law and evidence in this case. Please continue your deliberations." (Dkt. #26-13 at 11). The prosecutor and trial counsel affirmed that they had no objection, and the responses were submitted to the jury. (Dkt. #26-13 at 11).

Petitioner argues that the hearing on the jury note constituted a "critical stage" of the proceedings and that trial counsel's participation by phone amounted to a denial of counsel in violation of his Sixth Amendment right to counsel. He further asserts that had trial counsel "been present and devoted his full attention to the first jury note, he could have requested a definition of

'penetration.'" (Dkt. #15 at 100). Petitioner raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 96–101; Dkt. #24-8 at 19). The state habeas trial court issued the following findings and conclusions relevant to the claim:

130. Applicant argues that trial counsel was ineffective because he was not physically present when a jury note was read and responded to, but instead participated by telephone. There were several notes from the jury, but Applicant has narrowed down his complaint to one of the notes: the jury's request for a "legal definition of penetration.";

131. Prior to the jury's deliberations, the trial court announced that per trial counsel's request, if there was a jury note, counsel be able to appear by phone, and Applicant not appear at all. 13 RR 4. During deliberations, the jury sent out a note with two questions, one being a request for a legal definition of "penetration." 13 RR 7;

132. Trial counsel appeared by telephone and was an active participant in discussing the trial court's proposed responses to both questions in the jury note. 13 RR 7-11;

133. The trial court ultimately responded to the request for a legal definition of penetration with, "You have received all of the law and evidence in this case. Please continue your deliberations." 13 RR 11;

134. Applicant claims that the hearing on this jury note was a "critical stage" under the Sixth Amendment to the United States Constitution and that because it was a critical stage, this Court should analyze whether Applicant was deprived counsel under the standard in *United States v. Cronic,* 466 U.S. 648,659 (1984);

135. Applicant further claims that he was harmed by counsel's appearance by telephone because had he "been present and devoted his full attention" he could have requested a definition of "penetration";

136. The hearing on the jury's note was not a critical stage;

137. Applicant is correct that the Court of Criminal Appeals has not addressed the issue, but the issue has been addressed in Texas;

138. The Sixth Amendment right to counsel attaches at all "critical stages" of the criminal proceeding. *Cronic,* 466 U.S. at 659; *Routier v. State,* 112 S.W.3d 554, 587 (Tex. Crim. App. 2003);

139. There is no bright line as to whether each specific stage of a criminal proceeding constitutes a critical stage; rather, the circumstances of the specific proceeding must be considered in determining whether the trial was a critical stage. *Wingfield v. State,* 197 S.W.3d 922, 926 (Tex. App.-Dallas 2006, no pet.) (internal citations omitted);

140. In *Wingfield,* the Dallas Court of Appeals held that . . . article 36.27 of the Texas Code of Criminal Procedure (which sets forth the requirements for a trial court responding to a communication from a jury) requires only that the trial court use reasonable diligence to secure the presence of a defendant and his counsel and if the trial court is unable to secure their presence, shall proceed to answer the communication. A communication between the trial court and the jury does not constitute a critical stage of the proceeding that requires counsel to be present;

141. Because the hearing on the jury note was not a critical stage, this Court does not analyze harm under *Cronic;*

142. Applicant has failed to prove by a preponderance of the evidence that trial counsel was deficient for participating in the hearing on the jury note by telephone;

143. Applicant claims that had counsel been physically present at the hearing, he would have had the presence of mind to request a definition of "penetration";

144. It would have been impermissible for this Court to provide the jury with a definition of penetration because there is no statutory definition for penetration. *See* Tex. Code Crim. Proc. art. 36.14; *Green v. State,* 476 S.W.3d 440, 445 (Tex. Crim. App. 2015) (holding that it was error for the trial court to provide a definition for the terms "penetration" and "female sexual organ");

145. Applicant has failed to prove by a preponderance of the evidence that he was prejudiced by the alleged deficiency[.]

(Dkt. #24-5 at 203–06). The TCCA subsequently denied relief without written order based on the

state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt.

#23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner argues that the state court's denial of his claim that he was denied counsel during

a critical stage of his criminal proceeding was an unreasonable application of *Cronic*. Consideration

of this issue requires the Court to review the Supreme Court's holdings to determine what is

deemed to be a "critical stage" of a criminal proceeding under "clearly established federal law." *See Williams*, 529 U.S. at 412 (stating "clearly established Federal law" refers to holdings of the Supreme Court at the time of the state court's decision). "There is no Supreme Court authority that jury deliberations constitute a 'critical stage' for purposes of *Cronic*." *Richardson v. Lumpkin*, No. 2:22-CV-00176, 2023 WL 6164420, at *7 (S.D. Tex. Aug. 21, 2023) (concluding that the TCCA's resolution of the petitioner's claim that the trial court's failure to notify the petitioner and counsel of a jury note deprived the petitioner of his right to be assisted by counsel during jury deliberations was not contrary to clearly established federal law as determined by the Supreme Court). Additionally, the Supreme Court has not specifically recognized mid-deliberation communication with a jury as a critical stage of criminal proceedings. *Payton v. Crow*, No. CIV-19-700-SLP, 2022 WL 2531810, at *7 (W.D. Okla. July 7, 2022). Because no decision of the Supreme Court has addressed whether the consideration of a jury note during jury deliberations is a critical stage of a trial per se, "it cannot be said that the state court unreasonably applied clearly established Federal law'" in concluding that *Cronic* did not apply. *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted) (citing *Carey v. Musladin*, 549 U.S. 70, 77 (2006)); *see also Musladin v. Lamarque*, 555 F.3d 830, 842-43 (9th Cir. 2009) (finding no habeas relief was warranted based on the claim that the trial court received juror question mid-deliberations and, without consulting counsel, responded by reminding the jury of its original instructions—instructions to which the petitioner's counsel had already agreed—because the state court's application of law was not contrary to or an unreasonable application of the *Cronic* standard).

Moreover, assuming arguendo that consideration of jury notes during jury deliberations constitutes a critical stage of the criminal proceedings, there is no clearly established federal law

88

that a counsel's participation by phone during the consideration of jury notes amounts to a "complete denial of counsel" so as to entail application of *Cronic*. In *Wright*, the Supreme Court stated:

> Our precedents do not clearly hold that counsel's participation by speakerphone should be treated as a "complete denial of counsel," on par with total absence. Even if we agree with Van Patten that a lawyer physically present will tend to perform better than one on the phone, it does not necessarily follow that mere telephone contact amounted to total absence or "prevented [counsel] from assisting the accused," so as to entail application of *Cronic*. The question is not whether counsel in those circumstances will perform less well than he otherwise would, but whether the circumstances are likely to result in such poor performance that an inquiry into its effects would not be worth the time. Cf. *United States v. Gonzalez–Lopez*, 548 U.S. 140, 147, 126 S.Ct. 2557, 2563, 165 L.Ed.2d 409 (2006) (Sixth Amendment ensures "effective (not mistake-free) representation" (emphasis in original)). Our cases provide no categorical answer to this question, and for that matter the several proceedings in this case hardly point toward one. The Wisconsin Court of Appeals held counsel's performance by speakerphone to be constitutionally effective; neither the Magistrate Judge, the District Court, nor the Seventh Circuit disputed this conclusion; and the Seventh Circuit itself stated that "[u]nder *Strickland*, it seems clear Van Patten would have no viable claim," *Deppisch*, supra, at 1042.
>
> Because our cases give no clear answer to the question presented, let alone one in Van Patten's favor, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Musladin*, 549 U.S., at 77, 127 S.Ct. 649, 654 (quoting 28 U.S.C. § 2254(d)(1)). Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized.

552 U.S. at 125–26.

It must be remembered that the question on habeas review is not whether this Court believes that *Cronic* should apply—rather the question is only whether Petitioner has shown that the state court's decision finding that *Strickland* (not *Cronic*) applies "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Here, Petitioner cannot make that showing for a simple reason: the United States Supreme Court has never held that *Cronic* applies to claims

such as the ones asserted by him. In light of that fact, "it cannot be said that the state court unreasonably applied clearly established Federal law,'" and Petitioner's bid for review under *Cronic* must fail. *Wright*, 552 U.S. at 126 (quotation marks and brackets omitted); *see also Woods v. Donald*, 575 U.S. 312, 317–19 (2015) (holding that "federal habeas relief based upon *Cronic* is unavailable" unless the United States Supreme Court has held that "*Cronic* applies to the circumstances presented in th[e] case"). Accordingly, for the foregoing reasons, Petitioner's claims must be analyzed under *Strickland*, not *Cronic*. And, for the following reasons, they fail under *Strickland*.

The state court thoroughly reviewed the record, and applying the *Strickland* standard, concluded that trial counsel did not render ineffective assistance by participating by phone during consideration of the jury notes. Specifically, the state court determined that Petitioner was not prejudiced by trial counsel's participation by phone. Petitioner has failed to show that the state court's application of the *Strickland* prejudice standard was unreasonable. As the state court found, even if trial counsel would have requested the trial court to provide a definition of "penetration" had he appeared in-person instead of by phone, it would have been impermissible under Texas law for the trial court to provide such an instruction because there is no statutory definition for "penetration." *See* Tex. Code Crim. Proc. art. 36.14; *Green*, 476 S.W.3d at 445. The Court cannot review the correctness of the state court's interpretation of Texas state law regarding jury instructions. *See Young*, 356 F.3d at 628 (declining to review the state habeas court's determination of the validity of a Texas statute under the Texas constitution in the context of a *Strickland* claim). Therefore, even assuming trial counsel would have requested a jury instruction defining "penetration" had he been physically present at the hearing on the jury notes, because Petitioner

90

would not have been entitled to such a jury instruction even had one been requested, Petitioner has failed to demonstrate that there is a reasonable probability that, but for trial counsel's alleged deficiency in appearing by phone, the result of the proceeding would have been different.

In sum, Petitioner has not shown that the state court's conclusions that his claim was governed by *Strickland*, rather than *Cronic*, and that he was not prejudiced by trial counsel's appearance by phone, were contrary to, or involved an unreasonable application of, clearly established federal law, or were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

## C. Ineffective Assistance of Trial Counsel During Punishment Phase (Ground 3)

In his third ground for relief, Petitioner asserts that he was denied effective assistance of counsel during the punishment phase of trial because trial counsel (1) failed to object to the State witnesses' improper opinions that Petitioner "deserved a prison sentence instead of probation" and (2) failed to offer medical records and expert testimony related to Petitioner's kidney disease. (Dkt. #2 at 8; Dkt. #15 at 101–09).

In the state sentencing context, the relevant *Strickland* prejudice prong inquiry is whether, absent counsel's errors, there is a reasonable probability the petitioner's non-capital sentence would have been "significantly less harsh," *Spriggs v. Collins*, 993 F.2d 85, 88–89 (5th Cir. 1993),[12] taking into account "such factors as the [petitioner]'s actual sentence, the potential minimum and

---

[12] The *Spriggs* "significantly less harsh" standard applies here because Petitioner's habeas petition alleges ineffective assistance of counsel during a state sentencing hearing, not a federal one. *United States v. Grammas*, 376 F.3d 433, 438 & n.4 (5th Cir. 2004) (holding *Glover v. United States*, 531 U.S. 198, 203 (2001), which cites *Spriggs*, abrogates the significantly less harsh test only in the federal sentencing context). *See also Dale v. Quarterman*, 553 F.3d 876, 880 n.2 (5th Cir. 2008).

maximum sentences that could have been received, the placement of the actual sentence within the range of potential sentences, and any relevant mitigating or aggravating circumstances." *Dale v. Quarterman*, 553 F.3d 876, 880 (5th Cir. 2008) (quoting *United States v. Segler*, 37 F.3d 1131, 1136 (5th Cir. 1994) (citing *Spriggs*, 993 F.2d at 88)).

### a. Failure to object to opinions regarding punishment

First, Petitioner argues that trial counsel provided ineffective assistance by failing to object to the State witnesses' improper opinions that Petitioner "deserved a prison sentence instead of probation." (Dkt. #2 at 8; Dkt. #15 at 104–06).

The State asked fourteen lay witnesses whether they would have concerns about public safety if Petitioner were sentenced to probation. (Dkt. #26-14 at 23, 29, 37, 54, 60, 64, 68, 72, 75–76, 79, 86, 90, 97, 108). In the first instance, trial counsel objected to the question as invading the province of the jury, but the trial court overruled the objection. (Dkt. #26-14 at 23). The witnesses expressed their concerns that Petitioner would be around children again, that future victims would not be believed, that he would not be able to restrain himself if presented with an opportunity to offend, that he would have access to people through his profession, that he would not change and reoffend again, and that his offenses affected more than just the victims but also their families and relationships. (Dkt. #26-14 at 23, 29, 37, 54, 60, 64, 68–69, 72, 76, 79, 86, 90, 97, 108). Trial counsel also objected when one of the witnesses testified that she did not think that if Petitioner "were allowed to be on probation," Petitioner's girlfriend, Taylor, would be able to "follow" the condition that Petitioner "not be allowed to be around kids." (Dkt. #26-14 at 71). The trial court sustained the objection. (Dkt. #26-14 at 71). None of the witnesses explicitly stated that they wanted the jury to give Petitioner a non-probationary sentence.

The State also called Dan Powers, a licensed sex offender treatment provider, during the punishment phase of trial. (Dkt. #26-14 at 109–10). Powers testified that there is a large "continuum" regarding "sex offending." (Dkt. #26-14 at 118). He explained that, on one end of the continuum, there might be someone "who makes obscene phone calls," and on the other "end of that continuum," there might be someone who preys on a child. (Dkt. #26-14 at 118). He testified that "sex offenders towards the lesser part of that continuum can be treated successfully in the community" and can be taught "ways to control those impulses and to successfully be part of our society without victimizing anybody else." (Dkt. #26-14 at 118). He testified that, with sex offenders "on the other end of the spectrum," his concern is that "someone who pr[e]ys especially on children is not safe in our community because that's the most -- you don't get anymore vulnerable than a child" and "somebody who has shown that ability to pr[e]y on children, my concern is the only safe place for them to be would be in the penitentiary." (Dkt. #26-14 at 118–19). When asked about his concerns about Petitioner being in public, he stated that he had not assessed Petitioner as a licensed sex offender treatment provider and therefore could not give a clinical opinion on the matter. (Dkt. #26-14 at 122–23). Contrary to Petitioner's allegation (Dkt. #15 at 104), Powers did not testify that "'the only safe place [for petitioner] would be in the penitentiary' because he preyed on children." (Dkt. #26-14 at 109–30).

During the defense's punishment-phase case, trial counsel asked fourteen witnesses why they believed the jury should consider giving Petitioner a sentence on the lower-end of the range. (Dkt. #26-14 at 140, 146, 150, 154, 163, 168, 172, 178–79, 184, 191, 201, 207, 215, 220). In response, the witnesses cited Petitioner's good character, community involvement, talent, intelligence, and

kidney disease. (Dkt. #26-14 at 137–40, 146, 151, 155, 162–63, 171–72, 179–80, 184–85, 191, 216, 220-21).

Petitioner argues that trial counsel rendered ineffective assistance by failing to object to testimony that Petitioner deserved a prison sentence instead of probation. Specifically, he alleges that the witnesses testified that Petitioner "should receive a prison sentence" and that Powers testified that "'the only safe place [for petitioner] would be in the penitentiary' because he preyed on children." (Dkt. #15 at 104). He raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 102–03; Dkt. #24-8 at 21). After setting forth the *Strickland* standards (Dkt. #24-5 at 179, ¶ 3), the state habeas trial court issued the following findings and conclusions relevant to Petitioner's claim:

> 146. Applicant argues that trial counsel was ineffective because he did not object to the State's witnesses' testimonies that Applicant should be confined and not receive probation. Applicant complains about 14 pieces of testimony that he claims improperly stated that Applicant should not receive probation;

> 147. Trial counsel did object to two of the complained-of testimonies. 14 RR 23, 71-72. One of the objections was sustained. 14 RR 71-72;

> 148. Applicant has failed to meet his burden of proof by a preponderance of the evidence with regard to these two complained-of testimonies;

> 149. Applicant has not shown that the trial court would have erred in overruling his objection to the remaining 12 pieces of testimony;

> 150. Applicant claims that all of the testimony from the lay witnesses was inadmissible because it expressed their wishes and gave improper opinion testimony regarding the proper term of confinement, which is prohibited under Texas Rule of Evidence 702;

> 151. Applicant has mischaracterized the non-expert testimony in this case;

> 152. In all of the remaining complained-of instances, the State asked whether the witness had any concerns for public safety (in one instance about personal safety), and none of the witnesses responded that Applicant should receive a certain term

of confinement or even confinement over probation; the witnesses merely relayed to the jury their concerns for the safety of the community if Applicant were to receive probation;

153. Nothing about this testimony is inadmissible testimony regarding their wishes as far as punishment or the proper term of confinement;

154. Applicant has not met his burden of proof by a preponderance of the evidence that the trial court would have erred in overruling an objection to this testimony under the grounds alleged;

155. Applicant has not shown by a preponderance of the evidence that the trial court would have erred in overruling an objection to the expert, Dan Powers's testimony. The piece of testimony that Applicant complains about is, "the only safe place for them to be would be in the penitentiary." 14 RR 119;

156. Applicant misquotes the above testimony in his brief. Applicant modified the quote to replace the word "them" to say "[for applicant]." App. Brief, p. 70;

157. Instead, Powers's testimony taken as a whole shows that he was describing a continuum of sex offenders and the treatment of those offenders. 14 RR 118-19;

158. This was not a direct comment on what was an appropriate punishment for Applicant;

159. Applicant has not met his burden of proof by a preponderance of the evidence that counsel was deficient or th[at] he was prejudiced by the alleged deficiency[.]

(Dkt. #24-5 at 206–07).

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. The state court thoroughly reviewed the record, and applying the *Strickland* standard, concluded that trial counsel's handling of the non-expert witnesses' and expert witness's complained-of-testimony did not amount to ineffective assistance. Petitioner has failed to show that the state court's application of the *Strickland* standard was unreasonable. As the state court found, Petitioner mischaracterized the testimony of both the lay witnesses and the expert witness. Notably, none of the witnesses

95

testified that Petitioner should receive a specific punishment or a certain term of confinement. The state court thus found that the testimony was not improper under Texas law. *See Flores v. State*, No. 13-00-00566-CR, 2004 WL 1834399, at \*5 (Tex. App.— Corpus Christi–Edinburg Aug. 12, 2004, pet. ref'd) ("Under Texas law, a witness may not recommend a particular punishment to the jury.") (citing Tex. R. Evid. 701; *Sattiewhite v. State*, 786 S.W.2d 271, 290 (Tex. Crim. App. 1989); *Hughes v. State*, 787 S.W.2d 193, 196 (Tex. App.—Corpus Christi 1990, pet. ref'd)). This finding cannot be reviewed in a federal habeas proceeding. *See Young*, 356 F.3d at 628; *Little*, 162 F.3d at 862. Furthermore, the trial court had previously overruled trial counsel's objection to the State's question regarding concerns about public safety if Petitioner were sentenced to probation. Based on Texas law and the trial court's earlier ruling, trial counsel could have reasonably determined that the trial court would have overruled any further objection to the complained-of testimony given in response to the State's question. Indeed, the state habeas court concluded that Petitioner had failed to demonstrate that the trial court would have erred in overruling an objection to the complained-of-testimony. The state court applied the appropriate law, and the finding was based on a reasonable determination of the facts in light of the evidence presented in the state court proceeding. The state court adjudication was not contrary to, and did not involve an unreasonable application of, clearly established federal law. *See Emery*, 139 F.3d at 198 (stating that counsel is not ineffective for failing to make a meritless objection). Accordingly, this claim is denied.

### b. *Failure to present evidence corroborating Petitioner's kidney disease*

Second, Petitioner argues that trial counsel provided ineffective assistance of counsel by failing to present Petitioner's medical records or expert testimony from Petitioner's treating physicians to corroborate lay testimony regarding Petitioner's kidney disease. (Dkt. #2 at 8; Dkt.

#15 at 106–09). Specifically, Petitioner asserts that trial counsel failed to investigate, discover, and present medical records and testimony from his treating physicians. (Dkt. #15 at 106–09).

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "[A] petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial." *St. Aubin v. Quarterman*, 470 F.3d 1096, 1101 (5th Cir. 2006) (quoting *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005)). Additionally, "complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy," and counsel is entitled to a presumption that his performance was adequate. *Wilkerson v. Cain*, 233 F.3d 886, 892–93 (5th Cir. 2000). To demonstrate the required *Strickland* prejudice on his claim of ineffective assistance based on uncalled witnesses, a petitioner "must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial." *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002).

During the defense's punishment-phase case, Petitioner's girlfriend, Taylor, testified that she had personal knowledge of Petitioner's health and that he was "dying of kidney failure." (Dkt. #26-14 at 135). She explained that he was "in stage four of five stages of kidney failure" and "was given five years to live." (Dkt. #26-14 at 135). When asked why the jury should consider "the minimum or the lower range of the punishment," Taylor responded:

> I don't think when you planned your verdict that you knew that you were deciding a capital case. He is dying. And even at two years, he probably will die in jail. So at least at a minimum sentence he would stand a chance of getting out and dying with us instead of dying in jail. He can't hurt anyone at this point. There is no reason to put him away.

(Dkt. #26-14 at 140).

97

Other defense witnesses testified that the jury should consider a sentence in the lower range because it would be a "death sentence [for Petitioner], no matter what" (Dkt. #26-14 at 146); "[Petitioner's] health won't allow him to even make it through . . . the lightest punishment that he could have" (Dkt. #26-14 at 163); and "[Petitioner] has health problems and it could be the death of him" (Dkt. #26-14 at 184–85). Another defense witness testified that he had a "deep and grave concern for [Petitioner's] medical condition," "watched his health decline," and "just [did not] believe he [was] physically able to withstand a long incarceration." (Dkt. #26-14 at 179–80). Petitioner's brother testified that he was aware of Petitioner's medical problems and was concerned that he would not survive even a short prison sentence. (Dkt. #26-14 at 222). In closing, the State acknowledged Petitioner's medical problems:

> His being sick does not excuse what he did with his hands. And just because he is sick, that doesn't mean that he can't molest people anymore because those desires in his head aren't going to go away. That's what drives him. And just because he is sick doesn't mean he gets a lower sentence, because those women and those children deserve justice.

(Dkt. #26-14 at 254).

Petitioner argues that trial counsel rendered ineffective assistance by failing "to obtain and present Petitioner's medical records regarding his kidney disease and testimony from his treating physician to corroborate Taylor's lay testimony on the issue." (Dkt. #15 at 107). He raised this claim in his state habeas corpus proceedings. (Dkt. #24-5 at 103–05; Dkt. #24-8 at 21). At the evidentiary hearing, trial counsel testified that he could not recall whether he obtained Petitioner's medical records, whether he investigated Petitioner's medical issues before trial, or why he did not call a physician to corroborate Taylor's testimony. (Dkt. #28-8 at 153–54). Trial counsel also testified that they "had an entire team that was focused specifically on [Petitioner's] case,"

98

explaining that there was "more resource time, manpower, and effort put into [Petitioner's] case than any other case [he] [had] dealt with in [his] 21-year career"; that he had "three lawyers, an investigator, a jury consultant, a multitude of staff in [his] office"; and that they "pulled out all of the stops on [Petitioner's] case." (Dkt. #28-8 at 34).

The state habeas trial court found that trial counsel was an officer of the court, well known to the court, and credible, and that his testimony was credible. (Dkt. #24-5 at 179, ¶¶ 1–2). After setting forth the *Strickland* standards (Dkt. #24-5 at 179, ¶ 3), the court issued the following findings and conclusions relevant to Petitioner's claim:

> 2. At the hearing on the application for writ of habeas corpus, counsel could not recall if he obtained Applicant's medical records and could not recall why he did not call a physician to corroborate Applicant's girlfriend's testimony. Writ RR 138-39;
>
> 3. The hearing on the application for writ of habeas corpus was held almost 9 years after Applicant was convicted; Applicant was convicted in April 2013 and the hearing was held in January 2022;
>
> 4. Trial counsel's testimony that he could not recall his specific investigation and decision-making in this case is credible;
>
> 5. To prevail on a claim of ineffective assistance of trial counsel, an applicant must show by a preponderance of the evidence that: (1) trial counsel's performance was deficient in that it fell below the prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 684 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). Ineffective assistance allegations must be firmly founded in the record. *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).
>
> 6. To prevail on a claim that trial counsel was ineffective for failing to present evidence or witnesses he must show that the witness was available to testify or that the testimony or evidence would have been favorable. *Ex parte Ramirez*, 280 S.W.3d 848, 853 (Tex. Crim. App. 2007);
>
> 7. Applicant has filed the medical records he asserts trial counsel should have presented;

99

8. Those portions of the records that postdate trial have no bearing on Applicant's ineffective assistance of counsel claim because they were not available to counsel at the time of trial;

9. Applicant has wholly failed to identify which portions of the 82 pages of medical records contain the information that counsel should have presented to the jury;

10. Applicant has not presented an affidavit from his treating physician on what her testimony would have been;

11. There was testimony regarding Applicant's alleged advanced kidney disease and his life expectancy of only five years. 14 RR 135-36[];

12. At best, the records show that (1) the records come from Applicant's primary care physician who saw Applicant for a routine clinic follow-ups of kidney disease, (2) Applicant had been diagnosed with chronic kidney disease several years prior, and (3) the condition was worsening;

13. There is nothing in the records to suggest that the evidence or physician testimony would have been different or had any more impact than the testimony that was presented at trial;

14. Applicant has not directed this Court to anywhere in the records that states his life expectancy;

15. The jury could have sentenced Applicant anywhere from 2-20 years' confinement and sentenced him to 10 years', 10 years', 8 years', 12 years' and 15 years' confinement;

16. For the most part, Applicant was sentenced in the middle of the range of punishment;

17. The jury had already found him guilty of multiple offenses that occurred in his treatment room as a chiropractor;

18. Applicant has not shown by a preponderance of the evidence that any "corroborating" evidence of his kidney disease would have impacted the jury's punishment in these cases;

19. Applicant has failed to meet his burden of proof by a preponderance of the evidence that counsel was deficient for not admitting Applicant's medical records and not calling his treating physician to testify; and

20. Applicant has failed to meet his burden of proof by a preponderance of the evidence that he was prejudiced by this alleged deficiency.

(Dkt. #24-10 at 31–34). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. The state court thoroughly reviewed the record, and applying the *Strickland* standard, concluded that trial counsel's decision not to present medical records or expert testimony corroborating lay witnesses' testimony regarding Petitioner's kidney disease constituted deficient performance or prejudiced his defense. Petitioner has failed to show that the state court's application of the *Strickland* standard was unreasonable. The state court record demonstrates that whether Petitioner suffered from kidney disease was not disputed; indeed, the State acknowledged Petitioner's medical problems in its closing argument. Trial counsel was not deficient in failing to further investigate and present evidence or expert testimony corroborating testimony that was undisputed. The jury heard from multiple witnesses about Petitioner's alleged advanced kidney disease and his life expectancy of only five years, and Petitioner has not established that the medical records or testimony from his treating physicians would have shown a more dire medical condition than a five-year life expectancy. Furthermore, Petitioner failed show that any of his treating physicians were available to testify or what their testimony would have been.

Moreover, Petitioner has failed to show *Strickland* prejudice, that is, that his sentence would have been significantly less harsh with the Petitioner's medical records and testimony from his treating physicians. *See Rico v. Dir., TDCJ-CID*, No. 3:21-CV-399-S-BN, 2023 WL 2466791,

at *12 (N.D. Tex. Jan. 18, 2023), *report and recommendation adopted*, No. 3:21-CV-399-S-BN, 2023 WL 2470008 (N.D. Tex. Mar. 9, 2023). Petitioner faced a sentence between two years' and twenty years' confinement on each of the offenses for which was convicted. (Dkt. #28-1 at 98; Dkt. #28-2 at 152; Dkt. #28-3 at 99; Dkt. #28-4 at 118). Petitioner received an eight-year sentence, two ten-year-sentences, a twelve-year sentence, and a fifteen-year sentence. (Dkt. #28-1 at 106, 112; Dkt. #28-2 at 99, 101; Dkt. #28-3 at 102, 104; Dkt. #28-4 at 122, 125). Thus, as the state court found, Petitioner received mostly middle-range sentences. As aggravating factors, Petitioner's conduct affected multiple victims, including children, and he committed the offenses during chiropractic treatment. The complainants and their family members testified how Petitioner's conduct caused them to be uncomfortable around men and doctors, created debilitating anxiety, affected their relationships, and impacted their entire families. (Dkt. #26-14 at 56–60, 78, 80–84, 87–89). Ten additional witnesses testified that Petitioner subjected them to inappropriate sexual behavior during chiropractic treatment. (Dkt. #26-14 at 10–17, 19–23, 26–30, 33–37, 39–42, 43–48, 49–54, 63–64, 65–69, 91–97). As mitigating factors, trial counsel presented defense witnesses who testified to Petitioner's good character, community involvement, talent, and intelligence. (Dkt. #26-14 at 137–40, 146, 151, 155, 162–63, 171–72, 179–80, 184–85, 191, 216, 220-21). The jury heard from multiple witnesses that Petitioner was suffering from kidney disease (Dkt. #26-14 at 135, 140, 146, 163, 184–85, 179–80, 222), and trial counsel emphasized Petitioner's medical condition in closing when asking the jury for leniency (Dkt. #26-14 at 250–52). The State also acknowledged Petitioner's medical problems in closing. (Dkt. #26-14 at 254).

Given the nature of the offenses, the aggravating and mitigating factors, including that Petitioner suffered from advanced kidney disease, and the fact that Petitioner's sentences ranged

from the lower-middle-end to the upper-middle-end of the punishment range, Petitioner cannot show prejudice from trial counsel's performance at the punishment phase.

Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

## D.  Ineffective Assistance of Appellate Counsel (Ground 4)

In his fourth ground for relief, Petitioner argues that he was denied effective assistance of counsel because appellate counsel failed to raise several issues on direct appeal. Specifically, he asserts that appellate counsel should have raised a *Cronic* claim, a claim under Texas Code of Criminal Procedure article 36.27 and a related constitutional claim that his right to presence was violated during the discussion of the jury notes, and a sufficiency of the evidence claim concerning the sexual assault of E.L. (Dkt. #2 at 8; Dkt. #15 at 109–14).

The same two-pronged standard set out in *Strickland* to prove that counsel rendered unconstitutionally ineffective assistance applies equally to both trial and appellate attorneys. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Dorsey v. Stephens*, 720 F.3d 309, 319 (5th Cir. 2013). Thus, the standard for evaluating the performance of counsel on appeal requires inquiry into (1) whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and (2) whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of the petitioner's appeal would have been different. *Robbins*, 528 U.S. at 285; *Higgins v. Cain*, 720 F.3d 255, 260–61 (5th Cir. 2015). Appellate counsel who files a merits

brief need not, and should not, raise every non-frivolous claim. *Robbins*, 528 U.S. at 288; *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *see also Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir. 1989) ("The Constitution does not require appellate counsel to raise every nonfrivolous ground that might be pressed on appeal."). Counsel has a professional duty to choose among potential issues, according to his or her judgment as to their merit and his or her tactical approach, to maximize the likelihood of success on appeal. *See Jones*, 463 U.S. at 749, 752. The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U.S. 527, 536 (1986); *Barnes*, 463 U.S. at 751–52. Thus, to prove ineffective assistance of appellate counsel, a petitioner must show that the decision not to raise an issue on appeal was objectively unreasonable. *See United States v. Conley*, 349 F.3d 837, 841 (5th Cir. 2003) (citing *Strickland*, 466 U.S. at 687). And prejudice in this context requires the petitioner to show a reasonable probability that he would have prevailed on appeal. *Smith*, 528 U.S. at 285.

### 1.  Failure to Raise a *Cronic* Claim

Petitioner contends that he was denied effective assistance of counsel when appellate counsel failed to raise a *Cronic* claim related to trial counsel's participation by phone in the hearing on the jury note. (Dkt. #2 at 8; Dkt. #15 at 10–11).

When Petitioner raised this claim in his state habeas proceedings (Dkt. #24-5 at 106–07; Dkt. #24-8 at 23), the state habeas trial court found that the "hearing on the jury note was not a critical stage" and that "[i]f appellate counsel had raised this issue on direct appeal it would have been overruled." (Dkt. #24-5 at 209, ¶¶ 172–73). Based on this finding, the state court concluded that Petitioner "failed to prove by a preponderance of the evidence that appellate counsel was

104

deficient and that he was prejudiced by the alleged deficiency." (Dkt. #24-5 at 209, ¶ 174). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

As previously discussed, the Supreme Court has not held that *Cronic* applies to the situation here. Furthermore, the TCCA has determined that "[a] communication between the trial court and the jury does not automatically constitute a critical stage of the proceeding that requires [the defendant's] counsel to be present." *Wingfield v. State*, 197 S.W.3d 922, 926 (Tex. App. 2006). Thus, it cannot be said that the state court unreasonably applied clearly established federal law in finding that appellate counsel was not ineffective for failing to raise a *Cronic* claim on appeal because such claim would not have been successful on appeal. Petitioner has failed to show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

### 2. Failure to Raise a Right to Be Present Claim

Petitioner next asserts that he was denied effective assistance of counsel when appellate counsel failed to raise a claim under Texas Code of Criminal Procedure article 36.27[13] and a related

---

[13] Texas Code of Criminal Procedure article 36.27 addresses jury communications and provides in relevant part:

> The court shall answer any such communication in writing, and before giving such answer to the jury shall use reasonable diligence to secure the presence of the defendant and his counsel, and shall first submit the question and also submit his answer to the same to the defendant or his counsel or objections and exceptions, in the same manner as any other written instructions are submitted to such counsel, before the court gives such answer to the jury, but if he is unable to secure the presence

105

constitutional claim that his right to presence was violated. (Dkt. #2 at 8; Dkt. #15 at 11–14). Specifically, he argues that his absence from the hearings on the jury notes, coupled with the fact that he was not in the courtroom when the trial court stated that he had agreed to be absent, amounted to a violation of his right to be present under article 36.27 and the Constitution.

Petitioner raised this claim in his state habeas proceedings. (Dkt. #24-5 at 107–09; Dkt. #24-8 at 23). The state habeas trial court issued the following findings and conclusions relevant to the claim:

175. Applicant also claims that appellate counsel was ineffective for failing to raise a claim that the trial court violated article 36.27 because Applicant did not waive his right to be present when jury notes were discussed;

176. This argument would not have been successful on direct appeal;

177. During trial, the trial court stated, "With the permission by the Court, one of the things we wanted to take up . . . beforehand [ trial counsel] has asked if there is a note from the jury that he appear by phone and his client not appear at all. Is that what you want to do?" 13 RR 4. Trial counsel responded in the affirmative. 13 RR 4;

178. This would have been the only evidence before the court of appeals at the time it would have been tasked to decide whether Applicant waived his right under article 36.27 to be present during the hearing on the jury note;

179. The court of appeals would have had to presume the regularity of the proceedings and that Applicant had, in fact, waived his presence. *See Light v. State*, 15 S.W.3d 104, 107 (Tex. Crim. App. 2000);

180. Applicant's argument that Applicant had to personally waive his right under article 36.27 and thus, he would have been successful in a challenge to his waiver on direct appeal, is again based on the false presumption that article 36.27 creates a critical stage;

---

of the defendant and his counsel, then he shall proceed to answer the same as he deems proper. The written instruction or answer to the communication shall be read in open court unless expressly waived by the defendant.

Tex. Crim. Proc. Code Ann. Art. 36.27.

106

181. That is not correct under Texas case law;

182. A challenge to Applicant's waiver of his presence under article 36.27 would not have been successful on direct appeal;

183. Applicant has failed to prove by a preponderance of the evidence that appellate counsel was deficient for not raising this claim on direct appeal and that he was prejudiced by this alleged deficiency[.]

(Dkt. #24-5 at 210–11). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. Trial counsel requested that if the jury sent any notes that he be allowed to appear by phone and Petitioner not "appear at all." (Dkt. #26-13 at 4). The State did not have any objection, and the trial court agreed to the request. (Dkt. #26-13 at 4). There is no further record regarding Petitioner's waiver to be present. The state habeas court found that, under Texas law, the state appellate court would have presumed that Petitioner waived his right to be present and that the trial court's actions were consistent with article 36.27's requirements. *Green v. State*, 912 S.W.2d 189, 192 (Tex. Crim. App. 1995) (stating that "[i]n the absence of a showing to the contrary in the record, we presume the trial court's response was in open court and in appellant's presence" as required by article 36.27); *see also Word v. State*, 206 S.W.3d 646, 651 (Tex. Crim. App. 2006) (rejecting the appellant's argument that, "when the record is silent," the appellate court "should abandon *Green*'s presumption of a trial court's compliance with Article 36.27 requirements and adopt the opposite presumption of a trial court's noncompliance with Article 36.27 requirements"). Additionally, the

state court found that article 36.27 does not constitute a critical stage of the proceeding. *See Wingfield*, 197 S.W.3d at 926. This Court cannot review the state court's interpretation of Texas law. *See Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 67–68); *Charles*, 629 F.3d at 500-501; *Young*, 356 F.3d at 628; *Little*, 162 F.3d at 862; *Gibbs*, 154 F.3d at 259. Based on these findings, the state court concluded that any argument on appeal based on a violation of article 36.27 would not have been successful. The state court's application of *Strickland* was reasonable. Petitioner has failed to show that, but for appellate counsel's failure to raise the issue, there is a reasonable probability that the result of the appeal would have been favorable to Petitioner. The state court applied the appropriate law, and the finding was based on a reasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner has also failed to demonstrate that appellate counsel was ineffective for failing to raise a claim based on his constitutional right to be present at the hearing on the jury note. The core concern of the right to courtroom presence is that a defendant's "absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 820 n.15 (1975). To that end, the Supreme Court has held that "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the proceeding." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). Due process, however, does not require the defendant's presence when it would be useless or only slightly beneficial. *See Snyder v. Massachusetts*, 291 U.S. 97, 107–08 (1934) (concluding the presence of a defendant is required "to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only"), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964). If the defendant's presence does not bear a "reasonably substantial" relationship to the opportunity to defend, no harm will

result from a defendant's absence. *Id.* at 106. When there is no indication that the defendant "could have done [anything] had [he] been at the [hearing] nor would [he] have gained anything by attending[,]" a defendant's absence does not violate his due process rights. *Stincer*, 482 U.S. at 747 (alterations in original) (quoting *United States v. Gagnon*, 470 U.S. 522, 527 (1985) (per curiam)). In such a case, his "'presence would be useless, or the benefit but a shadow.'" *Id.* at 745 (quoting *Snyder*, 291 U.S. at 106–07).

Petitioner has not shown that his presence during the hearing on the juror note would have been helpful. Petitioner appears to contend that, had he been present at the hearing on the first jury note, he could have requested the trial court to provide the jury with the definition of "penetration." But, as previously discussed, the trial court would have erred in providing a legal definition of "penetration." In short, Petitioner does not establish that he would have gained anything by attending. *See Stincer*, 482 U.S. at 747. Petitioner therefore has failed to demonstrate that his absences violated his due process rights because his "presence would be useless, or the benefit but a shadow." *Id.* at 745 (quoting *Snyder*, 291 U.S. at 106–07). Thus, appellate counsel's failure to raise a claim based on Petitioner's constitutional right to be present at the hearing on the jury note does not constitute ineffective assistance of appellate counsel. *See Clark*, 19 F.3d at 966. Consequently, Petitioner has failed to demonstrate that the state court's rejection of this claim was unreasonable. Accordingly, this claim is denied.

### 3. Failure to Raise a Sufficiency of the Evidence Claim

Last, Petitioner asserts that appellate counsel provided ineffective assistance by failing to raise a sufficiency of the evidence claim concerning the sexual assault of E.L. (Dkt. #2 at 8). Petitioner did not provide any argument in support of his claim. (Dkt. #15 at 109–14). In his state

habeas application, Petitioner argued that a challenge to the sufficiency of the evidence would have been successful on appeal because the State was required to prove that E.L. was not Petitioner's spouse but failed to do so. (Dkt. #24-5 at 109–10; Dkt. #24-8 at 23). To the extent that Petitioner relies on the same argument here, such argument is unavailing.

To prove that his appellate counsel was ineffective, Petitioner must show that he would have had a successful sufficiency of the evidence claim on direct appeal. In *Jackson v. Virginia*, the Supreme Court established the standard for sufficiency of evidence claims. Because the state must prove beyond a reasonable doubt every fact necessary for the charged offense, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original); *see also Weeks v. Scott*, 55 F.3d 1059, 1061 (5th Cir. 1995).

The state habeas trial court rejected Petitioner's argument that, because the State was required to prove that E.L. was not Petitioner's spouse and failed to do so, a challenge to the sufficiency of the evidence would have been successful on appeal. (Dkt. #24-5 at 109–10; Dkt. #24-8 at 23). Specifically, the state habeas trial court issued the following findings and conclusions relevant to Petitioner' claim:

> 184. Applicant argues that appellate counsel was ineffective because he failed to challenge the sufficiency of the evidence to support his conviction for the sexual assault of E.L.F. on direct appeal. Applicant argues that such a challenge would have been successful because the State was required to prove that E.L.F. was not Applicant's spouse and they failed to do so;

> 185. Applicant was convicted of count three of the indictment in the cause number listing E.L.F. as the victim: intentionally and knowingly causing the penetration of the female sexual organ of E.L.F. by his finger, without her consent;

186. If Applicant had been convicted of sexual assault of a child under the version of Texas Penal Code § 22.011 in effect at the time of the offense (on or about October 18, 2002) the State would have been required to prove that E.L.F. was not Applicant's spouse based on the statute's definition of a "child." *See* Tex. Penal Code § 22.011 (a)(2), (c)(l) (Vernon 2002);

187. Applicant was charged with and convicted of sexual assault without consent, and that provision did not require proof that E.L.F. was not Applicant's spouse because E.L.F.'s status as a child was irrelevant. *See* Tex. Penal Code § 22.011(a)(l) (Vernon 2002); State's Writ Exhibit A.

188. A challenge to the sufficiency of the evidence to support Applicant's conviction for the sexual assault of E.L.F. would not have been successful;

189. Applicant has failed to prove by a preponderance of the evidence that appellate counsel was deficient for not challenging the sufficiency of the evidence and that he was prejudiced by the alleged deficiency[.]

(Dkt. #24-5 at 211–12). The TCCA subsequently denied relief without written order based on the state habeas trial court's findings after a hearing and on its independent review of the record. (Dkt. #23-21). This constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence and show that there was no reasonable basis for the state court to deny relief. Under Texas law, a person commits the offense of sexual assault if that person knowingly or intentionally causes the penetration of the anus or sexual organ of another person by any means without consent. Tex. Penal Code Ann. § 22.011(a)(1)(A). The state court found that, because the State was not required to prove that E.L. was not Petitioner's spouse pursuant to § 22.011(a)(1)(A), a challenge to the sufficiency of the evidence based on the State's failure to prove that E.L. was not Petitioner's spouse would not have been successful on appeal. Based on this finding, the state court concluded that appellate counsel was not ineffective for failing to raise a sufficiency of the evidence claim based on the State's failure to prove that E.L. was not Petitioner's spouse. Petitioner has failed to

show that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to habeas relief on this claim. Accordingly, this claim is denied.

## V. CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the Court of Appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B). Although Petitioner has not yet filed a notice of appeal, the Court, nonetheless, will address whether Petitioner would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (holding that a district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court," noting that "[f]urther briefing and argument on the very issues the court has just ruled on would be repetitious").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a substantial showing of the denial of a constitutional right in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). When a district court denies a petition on procedural grounds without reaching the underlying constitutional claim, a certificate of appealability should issue when the

112

petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.*

In this case, reasonable jurists could not debate the denial and dismissal of Petitioner's § 2254 petitions on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *See Miller-El v. Cockrell*, 537 U.S. 322, 336-37 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, Petitioner is not entitled to a certificate of appealability.

## VI.  CONCLUSION AND ORDER

Petitioner has failed to demonstrate that he is entitled to habeas relief. Petitioner has failed to demonstrate that trial counsel or appellate counsel rendered ineffective assistance under *Strickland*. Above all, Petitioner has failed to show the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *Williams*, 529 U.S. at 402–03, 405–06; *Childress*, 103 F.3d at 1224–25. In sum, Petitioner has failed to show that there was no reasonable basis for the state court to deny relief. *See Richter*, 562 U.S. at 98. Accordingly, Petitioner's habeas petitions are denied and dismissed with prejudice.

It is therefore **ORDERED** that the petitions for writs of habeas corpus pursuant to 28 U.S.C. § 2254 are **DENIED** and the cases are **DISMISSED** with prejudice. A certificate of

appealability is **DENIED**. It is further **ORDERED** that all motions by either party not previously

ruled on are **DENIED**.

**IT IS SO ORDERED**.

**SIGNED this 30th day of March, 2026.**

_____

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE